ROBERTS et al., Appellants,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY et al., Appellees.

[Cite as *Roberts v. State Farm Mut. Auto. Ins.
Co.*, 155 Ohio App.3d 535, 2003-Ohio-5398.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19785.

Decided Oct. 10, 2003.

536

Dwight D. Brannon, for appellants.

Steven G. Janik, Matthew J. Grimm and Jeffrey T. Peters;  Michael L. Close, for appellee and cross-appellant National Union Fire Insurance Company of Pittsburgh, PA.

Gordon D. Arnold, for appellee State Farm Insurance Company.

Fain, Presiding Judge.

{¶ 1} Plaintiffs-appellants Carol S. Roberts, her husband, Robert Roberts, and their daughters, Dawana and Dreama Roberts ("the Robertses"), appeal from a judgment rendered in their action to recover uninsured/underinsured motorist coverage against defendant-appellee and cross-appellant National Union Fire Insurance Company of Pittsburgh, PA. They assign as error the trial court's denial of their motion for a directed verdict, the trial court's refusal to instruct the jury on their proposed jury instruction, the trial court's failure to grant prejudgment interest from the date of Carol Roberts's injury, and the trial court's grant of National Union's motion for a modified verdict reducing Carol Roberts's verdict against National Union by a settlement amount paid by State Farm Mutual Automobile Insurance Company.

{¶ 2} The Robertses contend that the trial court erred in denying their motion for a directed verdict on the issue of causation, because reasonable minds could come to the conclusion only that Carol Roberts's back and rib injuries were proximately caused by the accident for which coverage was sought. Based on the record before us, we conclude that reasonable minds could come to different conclusions about whether Carol Roberts's injuries were proximately caused by the accident. Construing the evidence in a light most favorable to National Union, we conclude that the trial court did not err in denying the Robertses' motion for a directed verdict.

{¶ 3} The Robertses contend that the trial court erred in refusing to give their proposed jury instruction regarding the effect of subsequent medical malpractice on the issue of causation. We find that the Robertses' proposed jury instruction, regarding subsequent medical malpractice, is not an accurate statement of the law applicable to the facts of this case. We conclude that the trial court did not abuse its discretion in failing to instruct the jury as proposed by the Robertses, and that the Robertses were not prejudiced by the trial court's refusal to give their proposed jury instructions.

{¶ 4} The Robertses contend that the trial court erred when it granted prejudgment interest from the date summary judgment was granted in their favor against National Union regarding the issue of coverage. The Robertses contend that the trial court should have granted prejudgment interest from the accident, March 17, 1998, or, in the alternative, the date the Robertses notified National Union's insured of their claim, September 9, 1999. We conclude that the trial court did not abuse its discretion when it decided to award prejudgment interest from the date summary judgment was granted in favor of the Robertses against National Union, finding Carol Roberts's loss to be covered. The accrual

date falls within the range of dates previously approved by this court in various cases as reasonable.

{¶ 5} The Robertses contend that the trial court erred when it reduced Carol Roberts's verdict against National Union by the settlement amount paid by State Farm. The Robertses contend that National Union is not entitled to set off collateral sources of recovery because to do so defeats the purpose of underinsured motorist coverage, which is to allow an injured party to recover damages from an underinsured motorist carrier in an amount identical to those damages that the injured party would have been able to recover directly from the tortfeasor. We conclude that it was proper for the trial court to reduce Roberts's verdict against National Union by the settlement amount paid by State Farm because not to do so would result in Roberts receiving compensation double the amount of her injuries as determined by the jury. This result would be contrary to the purpose of uninsured and underinsured motorist ("UM/UIM") coverage, that being to compensate an injured insured, not to give the insured a windfall.

{¶ 6} National Union cross-appeals from a summary judgment rendered against it finding that National Union must provide UM/UIM coverage as a matter of law. National Union contends that the National Union policy is exempt from the requirements of R.C. 3937.18, because Emery, Roberts's employer, is self-insured. National Union further contends that Emery's prior rejections of UM/UIM coverage and subsequent selection of lesser limits of UM/UIM coverage met the requirements of R.C. 3937.18 and *Linko v. Indemn. Ins. Co.* (2000), 90 Ohio St.3d 445, 739 N.E.2d 338. National Union also contends that Roberts's injuries were not covered by the policy because a forklift is not a covered auto for purposes of UM/UIM coverage under the policy.

{¶ 7} We conclude that National Union's fronting policy with Emery does not render it self-insured, and, thus, the policy is not exempt from the requirements of R.C. 3937.18. We further conclude that the rejection and selection of lesser limits of UM/UIM coverage by Emery were not valid, because National Union did not make a meaningful offer; therefore, National Union is required to provide UM/UIM coverage as a matter of law. Although the National Union policy does exclude forklifts from covered autos, we conclude that this exclusionary provision does not apply to the UM/UIM coverage arising by operation of law.

{¶ 8} Accordingly, the judgment of the trial court is affirmed.

I

{¶ 9} On March 17, 1998, Carol Roberts was injured when a piece of steel fell on her foot while she was assisting a forklift operator at her place of employment, Emery Air Freight Corporation. In November 1998, Roberts began physical

therapy for her foot injury at the ProWork Center at Miami Valley Hospital. During physical therapy at ProWork, Roberts injured her back and ribs.

{¶ 10} At the time of the accident, Roberts was insured by State Farm Mutual Automobile Insurance Company for automobile liability, including a UM/UIM coverage limit of $100,000. Roberts's employer, Emery, was insured by National Union Fire Insurance Company of Pittsburgh, PA, at the time of the accident for commercial automobile liability with a policy period effective October 1, 1997, through October 1, 1998.

{¶ 11} The Robertses brought this action, in part, against State Farm and National Union, seeking UM/UIM coverage for Roberts's injuries. Subsequently, State Farm settled with the Robertses, admitting UM/UIM coverage and agreeing to pay its limits of $100,000 to settle all claims against State Farm. National Union filed a motion for summary judgment. The trial court denied National Union's motion for summary judgment, concluding that National Union was required to provide UM/UIM coverage as a matter of law.

{¶ 12} This case was tried by a jury. After the trial court completed its instructions to the jury, the Robertses moved for a directed verdict on the issue of causation as to Roberts's injuries. The Robertses also requested that the trial court instruct the jury regarding the effect of subsequent medical malpractice on the issue of causation. The trial court denied this request. The jury returned a verdict in favor of Carol Roberts in the amount of $92,000 for her foot injury. The jury found that Roberts's back and rib injuries were not proximately caused by the forklift accident.

{¶ 13} After the trial, the Robertses moved, in part, for a directed verdict and for prejudgment interest, and National Union moved for a modified verdict, requesting that the trial court reduce Roberts's verdict by the amount of the Robertses' settlement with State Farm. The trial court denied the Robertses' motion for a directed verdict and granted Roberts prejudgment interest from June 7, 2001, the date it had rendered summary judgment in favor of the Robertses against National Union on the issue of coverage. The trial court also granted National Union's motion for a modified verdict, reducing Roberts's $92,000 verdict against National Union by the $100,000 payment made by State Farm. From this judgment, the Robertses appeal, and National Union cross-appeals.

## II

{¶ 14} The Robertses' first assignment of error is as follows:

{¶ 15} "The trial court erred when it refused to direct a verdict in favor of plaintiffs/appellants on the issue of causation."

{¶ 16} The Robertses contend that the trial court erred in denying their motion for a directed verdict on the issue of causation because reasonable minds could come to but one conclusion: that Roberts's back and rib injuries were proximately caused by the forklift accident. The Robertses maintain that all of the evidence showed that the back and rib injuries were caused by the rehabilitation of Carol Roberts's foot injury from the accident—that there was no evidence that the back and rib injuries had any other cause.

{¶ 17} A motion for a directed verdict must be granted where the court, construing the evidence most strongly in favor of the nonmoving party, finds that reasonable minds could come to but one conclusion, upon any determinative issue, and that conclusion is adverse to the nonmoving party. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271. A motion for a directed verdict must be denied where there is substantial, competent evidence from which a reasonable mind could find in favor of the nonmoving party. Id. The court must not consider the weight of the evidence or the credibility of the witnesses but must determine whether there exists any evidence of substantial probative value in support of the nonmoving party. Id. A motion for a directed verdict presents a question of law in that the materiality of the evidence is examined rather than the conclusions to be drawn from the evidence. Id. at 680, 693 N.E.2d 271.

{¶ 18} In November 1998, Carol Roberts began physical therapy for her foot injury at the ProWork Center at Miami Valley Hospital. At trial, Roberts testified that she injured her back while using a leg press during the therapy. Roberts further testified that she continued to complain of back pain to her therapist, who had Roberts discontinue the use of the leg press. She testified that she continued her physical therapy despite the back pain. She also testified that she suffered a rib injury during physical therapy in February 1999, while pushing and pulling a heavy sled that had weights in it. Roberts testified that she did not immediately seek medical treatment for the rib injury but completed her physical therapy session and went home. Three days later, Roberts sought medical treatment for the rib injury. Roberts testified that she was unable to return to physical therapy for several months after her rib and back injuries.

{¶ 19} Roberts came under the care of Dr. Michael Pedoto at Miami Valley Hospital for her back and rib injuries. During the trial, Dr. Pedoto testified that based upon a reasonable medical certainty, Roberts had a lumbar strain, a back injury, and a right rib injury. Dr. Pedoto further testified to the following:

{¶ 20} "Q. Now, doctor, having received the information that you did that she had incurred this crushing injury to her foot, that her metatarsals were broken, that she went to the work hardening program and so forth, and after reviewing the records, based upon your training, experience, within terms of a reasonable

medical certainty, can you tell us the proximate producing cause for the rib injury and the back injury.

{¶ 21} "A. I'm not sure I fully understand your question, sir. Basically, she was injured in the course of rehabilitating from a foot injury, and those injuries to the back and ribs occurred as a result of treatment for a foot injury."

{¶ 22} Roberts testified that she sought medical treatment from another doctor, Dr. Joseph Paley, for her foot injury in the fall of 1999. Dr. Paley testified that during Roberts's initial office visit, she complained of pain in her left foot but did not complain of pain in any other part of her body. Dr. Paley further testified that there were no records of any office visits where Roberts complained of pain in any part of her body other than her foot.

{¶ 23} The record also shows that Dr. Paul Matrka performed an independent medical evaluation of Roberts. Dr. Matrka testified that when he saw Roberts, she did not complain of any injury other than her foot injury. On cross-examination, Dr. Matrka testified to the following:

{¶ 24} "Q. Okay. I'm going to ask you to assume that she's pretty reserved and not real open and somewhat backwards. You don't have an independent recollection—and if that's not the facts in this case, this question won't be allowed—but did you ask her if she had any other injury than the injury to her foot?

{¶ 25} "A. Yes. That's part of my history.

{¶ 26} "Q. Now, I'm uncomfortable—you said it's normally part of your history. In this particular case, do you have recollection that you asked her that?

{¶ 27} "A. Yes."

{¶ 28} On cross-examination, Dr. Matrka further testified to the following:

{¶ 29} "Q. I'm asking you in the records that you reviewed, did you find any reference to any neck, back pain—

{¶ 30} "A. There was an incident where she complained about when she was in work hardening.

{¶ 31} "Q. Doctor, did you find any evidence that as a result of the injury sustained to her foot, that before she went to the work hardening, she had some knee or back pain or other kind of pain related to her body?

{¶ 32} "A. No.

{¶ 33} "Q. Okay. Did you look for that?

{¶ 34} "A. Look for?

{¶ 35} "Q. For any other type of pain or anything like that?

{¶ 36} "A. Just based on what she's given me historically which is focused on her foot."

{¶ 37} Dr. Matrka testified that Roberts had a "nuisance fracture," and that he had never sent a patient with a fractured metatarsal to physical therapy. Dr. Matrka also testified to the following:

{¶ 38} "Q. Doctor, can we agree that if a patient is performing exercises improperly, they may be susceptible to injury?

{¶ 39} "A. Yes.

{¶ 40} "Q. Unrelated to the original injury?

{¶ 41} "A. That's correct."

{¶ 42} The record shows that Roberts's weekly progress note by ProWork, dated February 1, 1999, to February 5, 1999 included the comment that "client tends to hyperextend back to increase momentum for heavier overhead lifts." Roberts's discharge summary by ProWork, dated February 23, 1999, also provided, under client's limitations, that Roberts "required cueing to pace her program appropriately."

{¶ 43} Based on the foregoing evidence, we conclude that reasonable minds could come to different conclusions as to whether the back and rib injuries were proximately caused by the forklift accident. A reasonable mind might have found, from this evidence, that the injuries to Roberts's back and ribs were caused by her improper performance of the therapeutic exercises, which would have been an independent, intervening cause sufficient to break the chain of causation stemming from the forklift injury to her foot. Consequently, the trial court did not err in denying the Robertses' motion for a directed verdict.

{¶ 44} The Robertses' first assignment of error is overruled.

III

{¶ 45} The Robertses' second assignment of error is as follows:

{¶ 46} "The trial court erred when, after denying plaintiffs/appellants' motion for a directed verdict, it refused to instruct the jury regarding the effect of subsequent medical malpractice on causation."

{¶ 47} The Robertses contend that the trial court erred in refusing to give their proposed jury instruction regarding the effect of subsequent medical malpractice on the issue of causation.

{¶ 48} "The jury instructions given by a trial court must be a correct, clear, and complete statement of the law applicable to the case. We have previously stated that a 'trial court should give any requested instruction if it is

an accurate statement of law applicable to the facts of the case and reasonable minds could reach the conclusion sought by the instruction.' However, a trial court's decision on jury instructions is treated with deference and an appellate court will not reverse absent an abuse of discretion. An abuse of discretion * * * amounts to an attitude that is 'unreasonable, arbitrary, or unconscionable.' * * * Further, the party seeking reversal must show that the absence of the jury instruction was prejudicial to the substantial rights of its proponent." *Diamond v. Creager* (Mar. 1, 2002), Montgomery App. No. 18819, 2002 WL 313137, at * 3.

{¶ 49} The Robertses' proposed jury instruction on this subject is as follows:

{¶ 50} "You are instructed that the Defendant, National Union Fire Insurance Company, is liable for the original injury to Plaintiff, Carol Roberts, and you are hereby instructed as a matter of law that Defendant is liable to the Plaintiffs for any additional injury or condition flowing from Plaintiff's original injury caused by the accident on March 17, 1998.

{¶ 51} "Therefore, since the Defendant is liable to Plaintiff for her injuries in the March 17, 1998 accident, in your consideration of the amount of damages awardable to Plaintiffs, you may not consider the effect of any subsequent medical treatment or any delay, difference, or injury in treatment, including any aggravation of the original injury or any additional injury caused by that treatment or delay in treatment, as relieving Defendant of any responsibility for the whole amount of those damages. The subsequent injuries were reasonably foreseeable and the cause of the injuries was the events of March 17, 1998."

{¶ 52} The trial court instructed the jury, on the issue of proximate cause, using the standard Ohio Jury Instruction 11.30, as follows:

{¶ 53} "The causal connection of the first act of negligence is broken and superseded by the second, only if the intervening negligent act is both new and independent. The term 'independent' means the absence of any connection or relationship of cause and effect between the original and the subsequent act of negligence. The term 'new' means that the second act of negligence could not reasonably have been foreseen."

{¶ 54} The Robertses' proposed jury instruction regarding subsequent medical malpractice is not an accurate statement of the law applicable to the facts of this case. The record does not demonstrate any evidence supporting the Robertses' claim of subsequent medical malpractice in the treatment of Carol Roberts's injuries. However, the record does show, as noted in Part II, above, that there is evidence from which the jury might have found that Roberts proximately and independently caused her back and rib injuries by improperly performing her exercises in physical therapy. Thus, the jury instructions given by the trial court

on proximate cause were a correct, clear, and complete statement of the law applicable to this case. We conclude that the trial court did not abuse its discretion in failing to instruct the jury as proposed by the Robertses.

{¶ 55} The Robertses' second assignment of error is overruled.

## IV

{¶ 56} The Robertses' third assignment of error is as follows:

{¶ 57} "The trial court erred when it failed to grant prejudgment interest from the date of Roberts' injury."

{¶ 58} The Robertses contend that the trial court erred when it awarded prejudgment interest from the date summary judgment was rendered in favor of the Robertses and against National Union on the issue of coverage. The Robertses contend that the trial court should have granted prejudgment interest from the date of Roberts's work accident, March 17, 1998, or, in the alternative, the date the Robertses notified National Union's insured of their claim, September 9, 1999.

{¶ 59} R.C. 1343.03(A) provides that "when money becomes due and payable upon any * * * instrument of writing * * * and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten percent per annum."

{¶ 60} The Supreme Court of Ohio has held that claims for underinsured motorists coverage are contract claims arising from tortious conduct and that prejudgment interest may be awarded, since benefits are due and payable based upon an instrument of writing, the insurance contract. *Landis v. Grange Mut. Ins. Co.* (1998), 82 Ohio St.3d 339, 341, 695 N.E.2d 1140. Thus, National Union owes Roberts prejudgment interest, and the only issue is when it began to accrue.

{¶ 61} The Ohio Supreme Court has held that "[w]hether the prejudgment interest * * * should be calculated from the date coverage was demanded or denied, from the date of the accident, from the date at which arbitration of damages would have ended if [the insurance company] had not denied benefits, or some other time based on when [the insurance company] should have paid [the plaintiff] is for the trial court to determine." *Landis,* 82 Ohio St.3d at 342, 695 N.E.2d 1140.

{¶ 62} After reviewing various cases establishing different times of accrual for prejudgment interest, including the date of the accident, the date when a court determines that the loss is covered, and the date when a jury verdict is

rendered, we have concluded that a trial court has broad discretion in determining the date from which prejudgment interest should be calculated. *Horstman v. Cincinnati Ins. Co.* (Nov. 17, 2000), Montgomery App. No. 18430, 2000 WL 1720139, at * 3. We have declined to adopt a bright-line rule that prejudgment interest should be calculated from the date of the accident "unless and until the Ohio Supreme Court alters its current holding that when prejudgment interest should begin to accrue is a matter for the trial courts to decide within a broad possible range of options, and such decisions should not be overruled unless an appellate court finds an abuse of discretion." Id. at * 4. Thus, we have recognized that the trial court has a "very wide range of latitude in fixing a time for the interest to accrue." Id. at * 3.

{¶ 63} We conclude that the trial court's decision to award prejudgment interest from the date summary judgment was granted in favor of the Robertses against National Union, finding Roberts's loss to be covered, was not an abuse of discretion. The accrual date here "falls within the realm of time pinpointed in the various cases" previously reviewed by this court. See *Horstman*, 2000 WL 1720139, at * 4.

{¶ 64} The Robertses' third assignment of error is overruled.

V

{¶ 65} The Robertses' fourth assignment of error is as follows:

{¶ 66} "The trial court erred when it reduced the verdict against appellee by the amount of appellants' settlement with defendant State Farm."

{¶ 67} The Robertses contend that the trial court erred when it reduced Roberts's verdict against National Union by the amount of the Robertses' settlement with State Farm. The Robertses contend that National Union is not entitled to set off collateral sources of recovery because to do so would defeat the purpose of underinsured motorist coverage, which allows an injured party to recover damages from an underinsured motorist carrier in an amount equal to the amount of damages the injured party would have been able to recover directly from the tortfeasor.

{¶ 68} The Robertses and National Union dispute the legal nature of the underinsured motorist claim for purposes of determining whether the collateral-source rule applies. The Robertses contend that the underinsured motorist claim arises out of tort, in which event the collateral source rule applies. National Union contends that it arises out of contract, in which event the collateral source rule does not apply.

{¶ 69} The collateral source rule is " 'the judicial refusal to credit to the benefit of the wrongdoer money or services received in reparation of the injury caused

which emanates from sources other than the wrongdoer.'" *Carville v. Estate of Phillips* (Aug. 25, 2000), Miami App. No. 99CA52, 2000 WL 1209272, at * 2. We have held that " '[s]ubstantively, the collateral source rule is an exception to the general rule in tort actions that the measure of the plaintiff's damages is that which will make her whole. Through this exception, the plaintiff is allowed to receive more than the amount of damages she actually incurred. The rationale for the exception to the general rule is that benefits the plaintiff receives from a source wholly independent of the wrongdoer should not benefit the wrongdoer by reducing the amount of damages that a plaintiff might otherwise recover from him. As an evidentiary rule, the collateral source rule bars the introduction into evidence of collateral payments to the plaintiff in order to prevent the jury's consideration of such payments in determining the amount of damages.'" Id.

{¶ 70} The Ohio Supreme Court has held that "the legal basis for recovery under the uninsured motorist coverage of an insurance policy is contract and not tort." *Kraly v. Vannewkirk* (1994), 69 Ohio St.3d 627, 632, 635 N.E.2d 323. "The underlying public policy for provision of uninsured and underinsured motorist coverage is 'to assure that an injured person receive at least the same amount of compensation whether the tortfeasor is insured or uninsured.'" *Blue Cross & Blue Shield Mut. v. Hrenko* (1995), 72 Ohio St.3d 120, 123, 647 N.E.2d 1358. In *Hrenko,* the Ohio Supreme Court found that the insured's uninsured motorist coverage was not improperly reduced, because he received the same amount of compensation he would have received had the tortfeasor been insured. Id. The Ohio Supreme Court further found that it would be improper to place the insured in a better position than he was in before the accident, because "[t]he purpose of the uninsured motorist coverage is to compensate the individual and not to permit what might be viewed as a windfall." Id.

{¶ 71} Here, the jury did not receive evidence regarding the collateral source payment by State Farm to the Robertses, so it did not consider the State Farm payment in determining the amount of damages owed to Roberts. The jury determined that Roberts was injured and that her injuries could be made whole by compensating her in the amount of $92,000. Given that Roberts had already received compensation in the amount of $100,000 from State Farm, the jury's award establishes that she has already been fully compensated. To fail to reduce Roberts's verdict against National Union by the amount of the settlement with State Farm would result in Roberts's receiving compensation in an amount double the value the jury placed upon her loss—i.e., a windfall.

{¶ 72} We conclude that it was proper for the trial court to reduce Roberts's verdict against National Union by the amount of the settlement with State Farm. Based on this conclusion, we find it unnecessary to address the other arguments

raised by National Union in support of the trial court's reduction of the amount of the verdict.

{¶ 73} The Robertses' fourth assignment of error is overruled.

## VI

{¶ 74} National Union's sole assignment of error is as follows:

{¶ 75} "Whether the trial court erred and committed reversible error as a matter of law when it denied summary judgment in favor of defendant-appellee/cross-appellant National Union Fire Insurance Company of Pittsburgh, PA."

{¶ 76} National Union contends that the trial court erred in denying its motion for summary judgment, finding that National Union must provide UM/UIM coverage as a matter of law. We review the appropriateness of summary judgment de novo and follow the standards set forth in Civ.R. 56. *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588, 641 N.E.2d 265. "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 696 N.E.2d 201. Additionally, " 'an appellate court can decide an issue on grounds different from those determined by the trial court, so long as the evidentiary basis upon which the appellate court relies was addressed before the trial court and is a matter of record.' " *Grubb v. Michigan Mut. Ins. Co.*, Montgomery App. No. 19575, 2003-Ohio-1558, 2003 WL 1595175, at ¶ 13. With this standard in mind, we now address National Union's contentions regarding UM/UIM coverage.

{¶ 77} National Union contends that the National Union policy is exempt from the requirements of R.C. 3937.18 because Emery is self-insured. National Union maintains that Emery is self-insured in the practical sense, because the National Union policy fronts[1] motor vehicle liability protection for Emery, which in turn, retains the risk of loss up to $3,000,000.

{¶ 78} In Ohio, self-insurers, who comply with R.C. 4509.45(E) and 4509.72, are exempt from the requirements of R.C. 3937.18. *Grubb*, Montgomery App. No. 19575, 2003-Ohio-1558, at ¶ 18. However, we have previously held that a compa-

---

1. "A 'fronting agreement' is an insurance term indicating that an entity is renting an insurance company's licensing and filing capabilities in a particular state or states." *Tucker v. Wilson*, Clermont App. No. CA2002–01–002, 2002-Ohio-5142, 2002 WL 31155132. In practical effect, this type of policy typically involves the purchase of a liability policy with a deductible in the same amount as the coverage. *Grubb v. Michigan Mut. Ins. Co.*, supra.

ny's fronting agreement with an insurance company does not render it self-insured so as to avoid the requirements of R.C. 3937.18. Id. at ¶ 22.

{¶ 79} It is undisputed that Emery has failed to comply with the statutory requirements to qualify as a self-insured. National Union argues that the requirements of R.C. 3937.18 are not applicable, because Emery is self-insured in the practical sense based on the fronting policy. As we have previously held, "a company cannot be allowed to fail to comply 'with the statutory requirements for invoking self-insured status, [and at the same time seek to] declare itself a self-insurer for purposes of avoiding the requirements of the UM/UIM statute.'" *Grubb*, Montgomery App. No. 19575, 2003-Ohio-1558, at ¶ 21. We agree with the trial court, in this case, that "[i]t may be well and good and entirely lawful for a 'fronting agreement' [and 'facultative reinsurance agreement'] to spare [Emery] the expense and potential administrative quag-mires of formal registration in every state, territory and country where it does business and for these 'devices' to provide [Emery] the use of [National Union's] filings and claims service, but they do not paralyze or mute the walking and quacking duck of insurance coverage."

{¶ 80} We conclude that National Union's fronting policy with Emery does not render it self-insured for purposes of the statutory exemption from the require-ments of R.C. 3937.18.

{¶ 81} National Union further contends that Emery's prior rejections of UM/UIM coverage and subsequent selection of lesser limits of UM/UIM coverage met the requirements of R.C. 3937.18 and *Linko v. Indemn. Ins. Co. of N. Am.* (2000), 90 Ohio St.3d 445, 739 N.E.2d 338. The version of R.C. 3937.18 relevant to this case provides:

{¶ 82} "(C) The named insured may only reject or accept both coverages offered under division (A) of this section. The named insured may require the issuance of such coverages for bodily injury or death in accordance with a schedule of optional lesser amounts approved by the superintendent, that shall be no less than the limits set forth in section 4509.20 of the Revised Code for bodily injury or death. Unless the named insured requests such coverages in writing, such coverages need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverages in connection with a policy previously issued to him by the same insurer. If the named insured has selected uninsured motorist coverage in connection with a policy previously issued to him by the same insurer, such coverages offered under division (A) of this section need not be provided in excess of the limits of the liability previously issued for uninsured motorist coverage, unless the name insured requests in writing higher limits of liability for such coverages."

{¶ 83} The Ohio Supreme Court has held that " '[t]here can be no rejection pursuant to R.C. 3937.18(C) absent a written offer of uninsured motorist coverage from the insurance provider.' " *Linko,* 90 Ohio St.3d at 448, 739 N.E.2d 338. "[W]e cannot know whether an insured has made an express, knowing rejection of UIM coverage unless there is a written offer and written rejection. It only follows that a valid rejection requires a meaningful offer." Id. at 449, 739 N.E.2d 338. "To satisfy the offer requirement of R.C. 3937.18, the insurer must inform the insured of the availability of UM/UIM coverage, set forth the premium for UM/UIM coverage, include a brief description of the coverage, and expressly state the UM/UIM coverage limits in its offer[.]" Id. at 447–448, 739 N.E.2d 338.

{¶ 84} Here, Emery could not make a valid rejection or reduction of UM/UIM coverage unless a meaningful offer was first made in compliance with R.C. 3937.18 and *Linko.* See *Rohr v. Cincinnati Ins. Co.* (Mar. 28, 2002), Stark App. No. 2001CA00237, 2002-Ohio-1583, 2002 WL 491824, at * 7. The declarations page of the National Union Commercial Auto Policy provides that Endorsement # 00009 is to be referred to for the limits for UM/UIM coverage. Endorsement # 00009 of the National Union Commercial Auto Policy provides:

"REJECTION AND ELECTION OF MINIMUM LIMITS

"REQUIRED BY STATE PER UNINSURED AND

"UNDERINSURED MOTORISTS INSURANCE

"* * *

"IN THOSE JURISDICTIONS THAT HAVE NO STATE REQUIRE-MENTS FOR UNINSURED MOTORIST COVERAGE AND/OR UNDER-INSURED MOTORIST COVERAGE AND ALLOW AN INSURED TO REJECT HIS RIGHT TO SUCH COVERAGE, BY SIGNING THE AT-TACHED FORMS, THE INSURED EVIDENCES THAT THERE IS NO SUCH COVERAGE PROVIDED. ALL SUCH COVERAGE THAT MAY BE WAIVED OR REJECTED IS HEREBY WAIVED OR REJECTED.
"*STATE SELECTED LIMITS*

"* * *     * * *

"OHIO          REJECT

"* * *     * * *

"THIS ENDORSEMENT DOES NOT APPLY TO OWNED PRIVATE PAS-SENGER AUTOS. OWNED PRIVATE PASSENGER AUTOS ARE COV-ERED FOR UNINSURED/UNDERINSURED MOTORISTS AT LIMIT OF $500,000 PER ACCIDENT."

{¶ 85} This rejection fails to meet the requirements of R.C. 3937.18 and *Linko*. The rejection does not include a brief description of UM/UIM coverage or the premium for UM/UIM coverage, and it does not expressly state the coverage limits for UM/UIM coverage. Thus, Emery could not make a valid rejection of UM/UIM coverage because a meaningful offer was not made by National Union. We conclude that the rejection of UM/UIM coverage by Emery was not valid.

{¶ 86} In September 1995, Emery made a written request for a $500,000 limit on UM/UIM coverage and included a UM/UIM rejection form in the letter. The rejection form provided the following:

"REJECTION OF

"UNINSURED MOTORISTS/UNDERINSURED
MOTORISTS COVERAGE

"OR SELECTION OF LOWER LIMIT OF LIABILITY

"(Ohio)

"The Ohio Revised Code (Section 3937.18), amended, permits you, the insured named in the policy, to reject the Uninsured Motorists/Underinsured Motorists Coverage or to select a limit for such coverage lower than the limit for Bodily Injury Coverage in the policy. Uninsured Motorists Coverage provides insurance for the protection of persons insured under the policy who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom. Underinsured Motorists Coverage provides insurance for protection against loss for bodily injury, sickness or disease, including death, where the limit of coverage available for payment to the insured under all bodily injury liability bonds and insurance policies covering persons liable to the insured is less than the limit for the Uninsured Motorists Coverage under your policy at the time of the accident."

{¶ 87} The rejection form then gave the option of deleting UM/UIM coverage or lowering the limit of liability of UM/UIM coverage. This rejection form also fails to meet the requirements of R.C. 3937.18 and *Linko*. The rejection form neither sets forth the premium for UM/UIM coverage nor expressly states the coverage limits for UM/UIM coverage. Thus, Emery could not make a valid selection of lesser limits of UM/UIM coverage because a meaningful offer was not made by National Union. We conclude that the selection of lesser limits of UM/UIM coverage by Emery was not valid.

{¶ 88} "It is well settled that insurance companies must offer UM coverage with every automobile liability or motor vehicle liability policy delivered or issued

in this state. R.C. 3937.18(A). Failure to do so results in the insured acquiring UM coverage by operation of law." *Gyori v. Johnston Coca–Cola Bottling Group, Inc.* (1996), 76 Ohio St.3d 565, 567, 669 N.E.2d 824. Because the rejection and selection of lesser limits of UM/UIM coverage by Emery were not valid since National Union did not make a meaningful offer, UM/UIM coverage arises by operation of law. National Union is required to provide UM/UIM coverage as a matter of law.

{¶ 89} National Union further contends that Roberts's injuries were not covered by the National Union policy because a forklift is not a covered auto for purposes of UM/UIM coverage under the policy.

{¶ 90} We have held that " '[t]here is nothing, absent clear language evidencing an intent to do so, to prevent uninsured/underinsured coverage from being broader than liability coverage.' " *Shropshire v. EMC/Hamilton Mut. Ins. Co.* (Oct. 5, 2001), Montgomery App. Nos. 18803 and 18814, 2001 WL 1173334, at * 2. We have also held that "circumstantial exclusions * * * provided in a business liability policy do not apply to UM/UIM coverage impressed on the policy by operation of law because, where the parties themselves never intended UM/UIM coverage to be provided by the policy, [and] negotiated exclusions which the parties intended to apply to liability coverage cannot apply to the resulting UM/UIM coverage." Id. "[B]ecause [there was] no bargain concerning UM/UIM coverage, none of the circumstantial exclusions applicable to liability coverage to which the parties agreed apply to UM/UIM coverage impressed on the policy." Id. at * 3.

{¶ 91} Although the National Union Commercial Auto Policy does exclude forklifts from covered autos, we conclude that this exclusionary provision does not apply to the UM/UIM coverage arising by operation of law.

{¶ 92} For the foregoing reasons, we conclude that the trial court did not err in denying National Union's motion for summary judgment. National Union's sole assignment of error is overruled.

## VII

{¶ 93} All of the Robertses' assignments of error and National Union's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

GRADY and FREDERICK N. YOUNG, JJ., concur.