[Cite as *State v. Waller*, 2014-Ohio-237.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK   COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2013-CA-26 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2012-CR-0282 |
| v. | : | |
| | : | |
| JASON W. WALLER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of January, 2014.

. . . . . . . . . . .

DAVID A. WILSON, Atty. Reg. #0073767, by LISA M. FANNIN, Atty. Reg. #0082337, Clark County Prosecutor's Office, 50 East Columbia Street, 4th Floor, Post Office Box 1608, Springfield, Ohio 45501
        Attorneys for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. #0067020, and NICOLE RUTTER-HIRTH, Atty. Reg. #0081004, RION, Rion & Rion, L.P.A., Inc., 130 West Second Street, Suite 2150, Post Office Box 1262, Dayton, Ohio 45402
        Attorneys for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}    Defendant-appellant Jason W. Waller appeals from his conviction and sentence

for Felony Murder, Tampering with Evidence, and Carrying a Concealed Weapon. Waller contends that the trial court committed plain error by failing to instruct the jury concerning Aggravated Assault; that the trial court erred by concluding that the Castle doctrine did not apply in this case, and, further, by denying his request for an instruction on self-defense; that the trial court erred by denying his request for an instruction on Reckless Homicide; and that the trial court erred by overruling his motion to dismiss the Felony Murder count in the indictment upon the ground that it was defective, that count and bills of particulars not having identified the nature of the Felonious Assault alleged as the underlying felony. Waller also contends that there was prosecutorial misconduct throughout his trial, requiring reversal.

{¶ 2} We conclude that although the trial court did err by failing to instruct the jury concerning Aggravated Assault, in relation to the Felony Murder count, in the circumstances of this case that error did not rise to the level of plain error. We conclude that the trial court did not err when it decided that the Castle doctrine did not apply in this case, Waller having previously granted to the victim the exclusive possession of the premises where the homicide occurred, which Waller owned. We conclude that the trial court did not err in denying Waller's request for an instruction on self-defense, since no reasonable jury could have found, on the evidence presented, that Waller had no opportunity to retreat before using deadly force. We conclude that the trial court did not err in denying Waller's request for an instruction on Reckless Homicide, since, on the evidence presented, no reasonable jury could have found that Waller acted less than knowingly in stabbing his victim in the chest with a knife, penetrating six inches into the victim's chest. We conclude that the trial court did not err in overruling Waller's motion to dismiss the Felony Murder count in the indictment; the indictment used the words of the statute, and the

amended bill of particulars sufficiently identified the nature of the underlying felony, Felonious Assault.

{¶ 3}    Finally, we conclude that there was no prosecutorial misconduct in the trial rising to a level that deprived Waller of a fair trial.   Accordingly, the judgment of the trial court is Affirmed.


## I.   A Good Deed Has Deadly Consequences

{¶ 4}    Waller purchased the house at 154 Kewbury, in Springfield, in 2006.  He was employed as a radiographer at Mercy Medical Center, and later worked a second job with a Dr. Dahdah.   In September 2010, as a result of cutbacks in Medicare, Waller lost his job at the hospital, and his job with Dr. Dahdah became part-time.

{¶ 5}    Waller could not make ends meet.   He fell into arrears in his mortgage payments.   He moved in with his parents in Florida, hoping to make a new start there, but could not find work there, either.   In June 2011, he returned to 154 Kewbury, in Springfield, with Julie Ferryman, whom he would marry on February 14, 2012.

{¶ 6}    A former patient of Waller's, named Doss Smith, needed home health care after the death of his wife.   He offered Waller and Julie, a licensed practical nurse, the opportunity to come live with him, if they would take care of him.   There was no formal contract, but Waller and his wife moved in with Smith on February 28, 2012.   At that time, Waller had been in arrears on his mortgage for a "long time."   The bank had not begun foreclosure proceedings, but Waller anticipated that it would do so.

{¶ 7}    Waller had several friends help him move.   One of these was Donny Argabright,

the victim in this case. Argabright had his own housing problems. He was living with his girlfriend, Stacy Young, but he and his pit bull dog had been banned from the premises, so he was reduced to sneaking in and out. Waller agreed to let Argabright live at 154 Kewbury:

> There was no rent. There was no contract. I told him specifically, you know, the bank could foreclose in four weeks, you know, six weeks; or I might need it back for emergency. And he said, "Well, that's fine." He said he didn't have any problems about it. At that time he agreed. He said, "Well, I'll just move out." And that's what we agreed with.

{¶ 8} Waller and Julie moved in with Smith; Argabright moved into 154 Kewbury. Waller would occasionally go to 154 Kewbury to pick up his mail, which included medications mailed to him by the Veterans Administration.

{¶ 9} Waller and his wife ran into problems living with Doss Smith. Smith was abusing his medications, resulting in more than one hospitalization. Things came to a head when medics asked where Smith's medications were, and Waller told them they were in Smith's safe. After a telephone conversation with Smith's son, Waller concluded he and his wife could no longer stay at Smith's house. This was in the beginning of April 2012.

{¶ 10} Even before this, in mid-March, Waller had talked to Argabright about returning to 154 Kewbury to live. In the first phone conversation on this subject, Argabright initially agreed, after some discussion, that he would move out. But Argabright called Waller back five minutes later, furious, threatening to kill Waller if he even came over to 154 Kewbury. Waller decided to give Argabright some time to cool down.

{¶ 11} Waller and his wife explored various temporary housing possibilities, finally

moving into a motel room. This was about April 3, 2012. Waller's unemployment compensation had ended in March.

{¶ 12} On Monday, April 9, 2012, around 7:00 p.m., Waller drove to 154 Kewbury for his fateful confrontation with Argabright. Before leaving, he armed himself with a Derringer pistol, with four bullets, and a bladed weapon with a blade ten to twelve inches long and one inch wide, and a hilt. The State referred to the bladed weapon, which was never recovered, as a sword; Waller referred to it as a knife. We will adopt Waller's name for the weapon. Both the Derringer and the knife had been given to Waller by Doss Smith. Waller testified that his purpose in going to 154 Kewbury was to regain possession of his house, and to get his mail, including his medications, which were running low.

{¶ 13} Waller parked on the street, near the house, and walked to the door. From this point, the State's version of events and Waller's version begin to diverge. According to Waller, he opened the screen door (the inner door being at least partially open), in order to see if Argabright was there so he could talk to Argabright. According to Stacy Young, who was inside with Argabright, Waller was trying to get inside. In any event, Argabright blocked Waller's entry into the home.

{¶ 14} According to Young, Argabright was being conciliatory on the subject of his occupancy of 154 Kewbury, telling Waller, "Look, man, we're almost out of here. We just don't want any trouble." Waller was being provocative, challenging Argabright to "come outside and we'll settle this." At some point during this conversation in the doorway, Waller asked if he could at least get his mail, and Young got Waller's mail and handed it to him.

{¶ 15} Argabright eventually took his coat off (he was not wearing anything else above

his waist), and stepped outside. Both parties agree that Waller took the first swing. Waller testified that he failed to connect. Young testified that Waller connected with this swing, and with another, both times causing Argabright to stumble so that he had to use his arm to keep from falling all the way to the ground.

{¶ 16} Both parties agree that Argabright picked up a rock. Both parties agree that Waller pulled out his knife, which he had put in his boot. Either before Waller drew his knife, or as he was doing so, he threw the mail, including the mail containing his medications from the VA, onto the yard.

{¶ 17} According to the State's witnesses, Argabright dropped the rock when Waller first approached him with the knife. According to Waller, Argabright did not drop the rock until he was stabbed with the knife.

{¶ 18} After some movements on the driveway, in the vicinity of a vehicle parked there, Argabright wound up facing Waller, with Argabright's back to the garage door. Young testified that Argabright had been trying unsuccessfully to open the garage door, which did not have a handle, and then turned so that he was facing Waller. She testified that Waller lunged and stabbed Argabright in the chest with the knife.

{¶ 19} Waller testified that he was facing Argabright on the driveway, and that Argabright still had a rock in his hands above his head. Waller testified that he and Argabright approached each other:

> He was coming at me and with the rock above his head and he stepped out
> for me forward and I stepped forward; and I took the knife and I put it out and
> stabbed him, ran into him with it. And the rock, his rock flew to the right and

landed to the right side, landed about four feet to the right 'cause he was coming at force at me, and I came at force with him and collided.

{¶ 20} Waller's knife penetrated six inches into Argabright's chest, entering Argabright's heart and lungs and injuring his aorta and pulmonary artery, killing him.

{¶ 21} At several points in his testimony, Waller acknowledged that he intended to stab Argabright in the chest, but denied that he intended to kill Argabright. Waller testified that he was not aiming for a specific spot. Once, during cross-examination, the State elicited testimony from Waller that he meant to kill Argabright:

Q. Did you hear Mr. Yarchuk's testimony?

A. Yes, I did.

Q. And he said you said down in Tennessee that Donny – Donny Argabright ran into that sword.

MR. RION [representing Waller]: Objection. That wasn't the testimony. He said they collided.

THE COURT: Jury will recall the testimony.

BY MR. MERRELL [representing the State]:

Q. Today you're saying you definitely thrust the sword. Correct? You meant to stab him?

A. Yeah, he meant to kill me. I had to defend myself.

Q. And you meant to kill him.

A. Uh, yes.

[Whereupon, the prosecutor moved on to another subject.]

{¶ 22} Other than the one answer quoted above, Waller consistently denied having intended to kill Argabright, while acknowledging that he did intend to stab Argabright. The State did not refer to the above-quoted answer in its closing argument, arguing that the jury should infer that Waller had the purpose to kill Argabright. In fact, the State characterized Waller's testimony as having denied that he intended to kill Argabright: "And then he has the audacity to tell you he didn't mean to kill." Finally, the jury evidently concluded that the State had failed to prove that Waller had the purpose to kill Argabright, since it acquitted Waller of purposeful murder.

{¶ 23} After the stabbing, Waller retrieved his VA medications from the yard, returned to his car, and fled the scene.

{¶ 24} At some point during the confrontation leading up to the stabbing, Waller's Derringer pistol fell out of his pocket. Waller theorized that this was when he drew his knife; the State theorized that this was when Waller picked up the mail.

{¶ 25} Somewhere in Indiana, Waller threw the knife out the car window, "so no one would find [it]."

{¶ 26} Waller continued driving to a town in Tennessee where an old friend, Chris Yarchuk, was a police officer. He met with Yarchuk and told him what had happened. Waller was arrested.

## II. The Course of Proceedings

{¶ 27} Waller was charged by indictment with one count of Purposeful Murder, in violation of R.C. 2903.02(A), with a firearm specification; one count of Felony Murder, in

violation of R.C. 2903.02(B), with a firearm specification; one count of Tampering with Evidence, in violation of R.C. 2921.12(A)(1); and one count of Carrying a Concealed Weapon, in violation of R.C. 2923.12(A). He moved to dismiss the Felony Murder count in the indictment, contending that it was defective. This motion was overruled.

{¶ 28} Waller was tried to a jury. The trial court instructed the jury on the lesser offense of Voluntary Manslaughter as to each of the Murder counts, but declined to give an instruction on self-defense. The trial court found that the Castle doctrine did not apply, so that Waller had a duty to retreat before using deadly force to repel an attack. The trial court found that no reasonable jury, on the evidence presented, could find that Waller had no opportunity to retreat. The trial court also declined to give an instruction on Reckless Homicide.

{¶ 29} Waller was acquitted of Purposeful Murder, but was convicted of all other counts. The jury found against the State on the firearm specification pertaining to the Felony Murder count. Waller was sentenced to 15 years to life for Murder, 36 months for Tampering with Evidence, and 18 months for Carrying a Concealed Weapon, with all sentences to be served concurrently. From his conviction and sentence, Waller appeals.

**III. Although the Trial Court Did Err in Failing to Instruct the Jury on the Lesser Offense of Aggravated Assault, and, by Extension, Involuntary Manslaughter, that Error Was Not Preserved for Appellate Review, and, Under the Circumstances of this Case, Did Not Rise to the Level of Plain Error**

{¶ 30} Waller's First Assignment of Error is as follows:

THE JURY INSTRUCTIONS WERE IMPROPER, DEPRIVING

APPELLANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

{¶ 31}  Waller first contends that the trial court's failure to have instructed the jury concerning the lesser offense of Aggravated Assault constitutes plain error.  The trial court did instruct the jury, with respect to each of the Murder counts, that if it should find that the State had proven beyond reasonable doubt all of the elements of the offense, but that Waller had proven by the greater weight of the evidence that he knowingly acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite Waller into using deadly force, then it must find Waller guilty of Voluntary Manslaughter.  This was a proper instruction with regard to the count of Purposeful Murder, but Waller contends, and we agree, that it was not a proper instruction with regard to the count of Felony Murder.

{¶ 32}  Waller was charged, in the second count, with having committed Felonious Assault, proximately resulting in Argabright's death.  Had the jury been correctly instructed as to this count, then, if it should have found that the State met its burden of proof as to the elements, but that Waller had succeeded in proving, by a preponderance, that he acted under the sudden influence of passion or in a sudden rage, etc., it could not have found that Waller committed Felonious Assault, the predicate for the Felony Murder count.  Waller would instead have committed Aggravated Assault, which cannot be a predicate for Felony Murder, but which can be a predicate for Involuntary Manslaughter.   R.C. 2903.04(A).

{¶ 33}  The trial court gave the parties an opportunity to object to its proposed jury instructions.  Although Waller had other objections to the instructions, he did not object to that part of the jury instructions, as to the Felony Murder count, concerning the lesser offense of

Voluntary Manslaughter. Therefore, as Waller acknowledges, this error is governed by the plain-error standard of appellate review.

{¶ 34} Waller cites *State v. Warner*, 11th Dist. Portage No. 2008-P-0052, 2010-Ohio-4940, for the proposition that the trial court's failure to have instructed the jury concerning Aggravated Assault requires the reversal of his Felony Murder conviction. *Warner* is similar to this case in that the defendant in that case was charged with both Purposeful Murder and Felony Murder (based on Felonious Assault), and the trial court gave Voluntary Manslaughter instructions as to both Murder counts. As in the case before us, *Warner* involved a stabbing death.

{¶ 35} But there are important differences between *Warner* and the case before us. One difference is that in *Warner*, unlike in this case, the error *was* preserved for appellate review, requiring only ordinary prejudice for reversal. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Boyd*, 110 Ohio App.3d 13, 17, 673 N.E.2d 607 (2d Dist.1996), quoting from *State v. Long*, 53 Ohio St.3d 12, 444 N.E.2d 1332 (1978), syllabus.

{¶ 36} Another important difference between *Warner* and this case is that in *Warner* the jury found the defendant guilty of Voluntary Manslaughter as to the count charging Purposeful Murder, but guilty of Felony Murder.[1] To have found the defendant in that case guilty of Voluntary Manslaughter on the Purposeful Murder count, the jury necessarily must have found that the defendant acted under the influence of a sudden passion or in a fit of sudden rage, etc.,

---

[1] The court concluded that the inconsistency in the jury's verdicts was not itself a basis for reversal, because the inconsistency involved different counts. *Warner*, ¶ 71.

rendering plausible the conclusion that the incorrect instruction concerning the Felony Murder count affected the jury's verdict as to that count.

{¶ 37} In the case before us, there is no apparent inconsistency in the jury's verdicts as to the Purposeful Murder and Felony Murder counts. Because the jury found Waller not guilty of Purposeful Murder (presumably because it found that the State had failed in proving, beyond a reasonable doubt, that Waller had the purpose to kill Argabright), it never reached, as to that count, the issue of whether Waller had proven, by a preponderance, that he had acted under the influence of a sudden passion or in a fit of sudden rage, etc.

{¶ 38} In the case before us, as the jury was (erroneously) instructed, it would presumably have found Waller guilty of Voluntary Manslaughter as to the Felony Murder count if it had found that Waller had succeeded in proving, by a preponderance of the evidence, that he had acted under the influence of a sudden passion or in a fit of sudden rage, etc. It did not do so. Therefore, we consider it unlikely that this error in the jury instructions prejudiced Waller. Consequently, we conclude that this is not the exceptional case where notice of a plain error must be taken to avoid a manifest miscarriage of justice.

## IV.  The Trial Court Did Not Err in Concluding that
## the Castle Doctrine Is Inapplicable in this Case

{¶ 39} In denying Waller's request for a jury instruction on self-defense, the trial court determined that the Castle doctrine is not applicable, so that Waller had a duty to retreat from the confrontation, if possible, before using deadly force. Waller contends that the trial court erred in determining that the Castle doctrine is not applicable in this case.

{¶ 40} The Castle doctrine takes its name from the maxim that a man's home is "his castle." *State v. Comer*, 4th Dist. Gallia No. 10CA15, 2012-Ohio-2261, ¶ 11, citing 4 Blackstone, Commentaries on the Laws of England (Rev. Ed.1979) 223, Chapter 16. The Castle doctrine is now codified in R.C. 2901.09(B):

> For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

{¶ 41} "Residence," for purposes of R.C. 2901.09, is defined in R.C. 2901.05. R.C. 2901.09(A). R.C. 2901.05(D)(3) defines "residence" as "a dwelling in which a person resides either temporarily or permanently or is visiting as a guest." Before the enactment of what is now R.C. 2901.05(D)(3) in 2008, we held that a defendant claiming the benefit of the Castle doctrine – that is, that he has no duty to retreat in his own home – "must inhabit, even if temporarily, the dwelling itself." *State v. Taylor*, 2d Dist. Miami No. 95-CA-25, 1996 WL 562796, *6 (Sept. 27, 1996); cited approvingly in *In re D.N.*, 195 Ohio App.3d 552, 2011-Ohio-5494, 960 N.E.2d 1063 (8th Dist.), at ¶ 19, a case decided after the enactment of the definition of "residence" in R.C. 2901.05(D)(3).

{¶ 42} Query whether the driveway upon which Waller fatally stabbed Argabright can qualify as a "residence" for purposes of R.C. 2901.09. "Residence" is defined in R.C.

2901.05(D)(3) in terms of a "dwelling," and "dwelling" is defined in R.C. 2901.05(D)(2):

"Dwelling" means a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile. As used in this division, a building or conveyance includes, but is not limited to, an attached porch, and a building or conveyance with a roof over it includes, but is not limited to, a tent.

{¶ 43} For purposes of this appeal, we will assume, without deciding, that the driveway at 154 Kewbury was part of the residence for purposes of R.C. 2901.09.

{¶ 44} Waller cites *State v. Barnette*, 12th Dist. Butler No. CA2012-05-099, 2013-Ohio-990, for the proposition that it is implied in that case "that ownership of the residence is critical for determining whether the Castle Doctrine applies." In that case, the defendant went to the victim's apartment to collect "drug money" the victim owed him; following some discussion, the defendant shot and killed the victim. *Id.* at ¶ 2. The defendant in that case argued that it was plain error not to instruct the jury that he had no duty to retreat. *Id.* at ¶ 53. The court of appeals noted that the trial court had, in fact, instructed the jury that "[a] person who lawfully is in his residence has no duty to retreat before using force in self-defense or defense of his residence." *Id.* at ¶ 56. The court of appeals then noted that: "The mere fact that one is lawfully inside the residence of another does not invoke the strictures of the castle doctrine. * * * . Rather, to invoke the castle doctrine in this case, appellant must have been the lawful occupant or resident of the Fairfield Residence." *Id.* at ¶ 57.

{¶ 45} We find nothing in *Barnette* to support the proposition that a defendant's mere

ownership of a residential dwelling, without either presently residing in the dwelling temporarily or permanently, or visiting it as a guest, vitiates the defendant's duty to retreat before using deadly force.

{¶ 46}   Waller also cites *State v. Lewis*, 2012-Ohio-3684, 976 N.E.2d 258 (8th Dist.).   In that case, a conviction was reversed because of a failure to correctly instruct the jury concerning the Castle doctrine.   But the defendant in that case committed the murder in his own home, in which he was then residing.   *Id.* at ¶ 3-7.   Similarly, in *State v. Kozlosky*, 195 Ohio App.3d 343, 2011-Ohio-4814, 959 N.E.2d 1097 (8th Dist.), another case Waller cites, the defendant committed the murder in the home in which he then resided.   *Id.* at ¶ 4, 11.

{¶ 47}   In the case before us, the evidence, including Waller's own testimony, establishes that he ceased using 154 Kewbury as his residence, even temporarily, when he went to live with Doss Smith, and agreed to allow Argabright to use 154 Kewbury as Argabright's residence.   It is also clear from the evidence in the record, including Waller's own testimony, that Waller was not visiting 154 Kewbury as a guest when he went there for his fatal confrontation with Argabright. By Waller's own testimony, Argabright had made it clear that Waller was not welcome at the residence.

{¶ 48}   We agree with the trial court that the Castle doctrine is inapplicable to the case before us.

**V.   The Trial Court Did Not Err in Concluding that Waller**

**Was Not Entitled to an Instruction Concerning Self-Defense,**

**Because No Reasonable Jury Could Have Found, on this Evidence,**

**that Waller Had No Opportunity to Retreat Before Using Deadly Force**

{¶ 49} To establish self-defense to a charge of murder, a defendant must show that he was not at fault in creating the situation giving rise to the affray, that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from that danger was in the use of deadly force, and that the defendant did not violate any duty to retreat. *State v. Jackson*, 22 Ohio St.3d 281, 283, 490 N.E.2d 893 (1986).

{¶ 50} In the case before us, it requires a stretch to find that Waller was not at fault in creating the situation giving rise to the affray, since, by his own admission, he took the first swing, even though he claimed that he failed to connect. But even if a reasonable jury might find for Waller on that issue, no reasonable jury could find that his only means of escape was in the use of deadly force and that he did not violate his duty to retreat. Waller's own testimony establishes that he had opportunities to retreat, but failed to avail himself of them. According to Waller, Argabright threatened to kill him even before Argabright picked up a rock. Waller testified that after he pulled the knife, Argabright, armed with the rock, "started backing up towards the glass of the back window of the Blazer," (not Waller's vehicle) which was in the driveway. Instead of retreating, Waller "got angry and * * * took the end of my knife and went forward towards him and * * * hit the back of the windshield." At a slightly later point, according to Waller, Argabright went to the front of the Blazer, while Waller circled back. Again, instead of retreating, Waller "came forward."

{¶ 51} We conclude that the trial court did not abuse its discretion in denying Waller's request for an instruction on self-defense.

## VI.   The Trial Court Did Not Err in Concluding that Waller Was

## Not Entitled to an Instruction Concerning Reckless Homicide

**{¶ 52}**   Waller requested an instruction concerning Reckless Homicide.   That offense is proscribed by R.C. 2903.041(A): "No person shall recklessly cause the death of another * * * ."

**{¶ 53}**   The culpable mental states of "knowingly" and "recklessly" are set forth in R.C. 2904.22(B) and (C):

(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

(C) A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

**{¶ 54}**   The trial court, in rejecting Waller's request for an instruction on Reckless Homicide, ruled:

As to the instructions on reckless homicide, I heard the arguments as to how the jury could find reckless intent – or reckless mens rea.   The evidence that through the testimony of various witnesses, including the Defendant, would not indicate a reckless mens rea in this case but one of at least knowingly.   The jury could find purposely.   That would be a jury decision, but at least knowingly. Under the facts that have been presented, the testimony of all the witnesses,

including the Defendant, the Court finds that reckless homicide is not a proper instruction.

**{¶ 55}** We agree with the trial court. By his own admission, Waller did not merely act with heedless indifference to the consequences, perversely disregarding a known risk that by stabbing Argabright in the chest with the knife he would cause serious injury; he was aware that by stabbing Argabright he would be causing serious physical harm. By Waller's own admission, the stabbing was not an accident – he meant to stab Argabright. No reasonable jury could find, on this evidence, that Waller did not know that by stabbing Argabright in the chest with a ten-to-twelve-inch knife blade he would be causing Argabright serious physical harm.

**{¶ 56}** Waller's First Assignment of Error is overruled.

## VII.    The Trial Court Did Not Err in Overruling Waller's

## Motion to Dismiss the Felony Murder Count in the Indictment

**{¶ 57}** Waller's Second Assignment of Error is as follows:

THE DENIAL OF WALLER'S MOTION TO DISMISS THE INDICTMENT WAS AN ERROR BECAUSE THE INDICTMENT CONTAINED STRUCTURAL ERRORS WHICH WERE NOT REMEDIED BY THE BILL OF PARTICULARS.

**{¶ 58}** In this assignment of error, Waller challenges the sufficiency of that part of the indictment, Count Two, charging him with Felony Murder. Waller concedes that an indictment tracking the wording of the Felony Murder statute, R.C. 2903.02(B), does not need to specify the underlying felony upon which the charge is based, as long as the underlying offense is identified in a bill of particulars, citing *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d

215. He contends that the underlying felony in his case was not sufficiently identified, because of a discrepancy between the initial bill of particulars, which he contends alleged the underlying felony to be Felonious Assault by causing or attempting to cause physical harm by means of a deadly weapon – R.C. 2903.11(A)(2) – and the amended bill of particulars, which alleged the underlying felony to be Felonious Assault by causing serious physical harm – R.C. 2903.11(A)(1).

{¶ 59} Count Two of the indictment specified Felonious Assault as the felony upon which the charge of Felony Murder was based, but did not further identify the factual basis for the alleged Felonious Assault. Count Two also had an attached firearm specification.

{¶ 60} The initial bill of particulars, filed September 18, 2012, set forth the following in relation to Count Two of the indictment:

Count II: On April 9, 2012 and in the driveway of 154 Kewbury Road, Springfield, Clark County, Ohio Jason Waller stabbed Donald Argabright in the chest and Donald Argabright died as a result of the stabbing. Jason Waller in doing so had on his person or under his control a firearm while committing the offense.

{¶ 61} Significantly, the second sentence set forth above was identically set forth in that part of the initial bill of particulars pertaining to Count One of the indictment. Each sentence appears to have been intended to identify the basis for the firearm specification attached to the particular count in the indictment to which it pertained.

{¶ 62} The "Amended Bill of Particulars," filed October 17, 2012, states, in its entirety, as follows:

As to Count II and in addition to the Indictment:

On April 9, 2012 and in the driveway of 154 Kewbury Road, Springfield, Clark County, Ohio Jason Waller knowingly caused serious physical harm to Donald Argabright by stabbing him in the chest with either a sword or knife piercing his heart, lung, and aorta, a violation of R.C. 2903.11(A)(1), Felonious Assault, an offense of violence that is a felony of the second degree. Jason Waller caused the death of Donald Argabright as a proximate result of Jason Waller committing or attempting to commit that Felonious Assault.

Counts I, III, and IV remain as stated and filed on September 18, 2012.

{¶ 63} It seems to us that as to Count Two of the indictment, the Amended Bill of Particulars was intended to supersede the bill of particulars filed a month earlier, but even if that is not the case, we see no basis for confusion. The reference in the first bill of particulars to Waller's having had a firearm on his person appears to have identified the factual basis for the firearm specification, not the type of Felonious Assault alleged to have proximately caused Argabright's death. In each bill of particulars, the factual basis for the Felonious Assault is clearly identified as Waller's having stabbed Argabright in the chest with the bladed weapon that was variously referred to at trial as a sword or a knife. In our view, this was sufficient to identify the factual basis for the felony underlying the Felony Murder count of the indictment.

{¶ 64} Waller's Second Assignment of Error is overruled.

**VIII.   There Was No Prosecutorial Misconduct Rising**

**to a Level Requiring Reversal of Waller's Conviction**

{¶ 65}   Waller's Third Assignment of Error is as follows:

THE PROSECUTOR ENGAGED IN MISCONDUCT THROUGHOUT THE ENTIRE TRIAL, TAINTING THE WHOLE PROCEEDINGS, DEPRIVING APPELLANT OF A FAIR TRIAL.

{¶ 66}   The test for reversible prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused.  *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000).  The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor.  *Id.*

{¶ 67}   Waller first cites the following colloquy during cross-examination:

Q.  Mr. Waller, would you agree that you pretty much have an answer for everything here this morning?

A.  No, sir, I don't.

Q.  You mentioned you had the discovery packet, didn't you?

A.  Yes, sir, I did.

Q.  What is a discovery packet?

A.  I'm not sure.   I just received it from the lawyer.

Q.  Yeah, had the statements of every witness, didn't it?

A.  Yes, I guess it did.

Q.  And you read those statements, didn't you?

A.  Yes.   I didn't have all the discovery packet though.

Q.  It helped you decide how your questions were gonna be this morning, didn't it?

A.   No, sir.

**{¶ 68}**   As the State noted, Waller had alluded to his having received the discovery packet on direct examination, when he was asked whether he knew that the Derringer pistol had fallen out of his pocket during his confrontation with Argabright.   There was no objection to the line of questioning quoted above.   The State did not address this subject in its closing arguments.

**{¶ 69}**   We conclude that it was not improper for the State to have elicited from Waller that he had access to a discovery packet containing witness statements in advance of his testimony.   Even if it were not proper for the State to have done so, we find nothing in this line of questioning that implicates the fairness of the trial.

**{¶ 70}**   Waller next cites the following exchange during his cross-examination:

Q.   Where were the tears before we broke?   You didn't shed any tears.

MR. RION [representing Waller]: Objection.   That's not true.

MR. MERRELL [representing the State]: It is true.

THE COURT: Counsel, you're being argumentative with the witness.

MR. MERRELL: Well, I can't help it, Judge.   I'll try not to, though.

THE COURT: You will not be argumentative with the witness.

**{¶ 71}**   The prosecutor then moved on, and did not return to this subject again.   We find nothing in this exchange that would vitiate the fairness of the trial.   Waller's objection was sustained, and the prosecutor was admonished.   Counsel disagreed in front of the jury whether Waller had shed tears at a previous point during the trial, and the jury could reach its own conclusion in that regard, to the extent that it might aid the jury in evaluating Waller's testimony.

**{¶ 72}**   Waller next cites the following exchange during his cross-examination:

Q. Carrying a Bible in and out of the courtroom and having it on the table in front of you, are you trying to sway this jury in any way –

MR. RION: Objection.

THE COURT: Sustained. Jury will disregard the question.

**{¶ 73}** The prosecutor moved on to another subject, and did not again refer to Waller's Bible, either in questioning or in argument. Neither in connection with this exchange, nor at any other time during the trial, did Waller seek a mistrial. We presume that the jury followed the trial court's instruction to disregard this question.

**{¶ 74}** The next exchange cited by Waller occurred immediately after a recess for lunch:

Q. Let's go over a couple of exhibits. Did you see pictures of the Samsung phone that we showed in court?

A. No, sir.

Q. You weren't paying attention to what was on the screen or what?

MR. RION: Objection.

THE COURT: Sustained. Jury will disregard the question.

BY MR. MERRELL:

Q. Exhibit 8-A, can you identify that?

A. Yes, it's my cell phone.

Q. Okay. That's what I'm asking.

**{¶ 75}** This ill-advised crticism of the witness served no apparent purpose, and was immediately the subject of an objection that was sustained. The prosecutor made no subsequent reference to his suggestion that Waller was not paying attention. We find no likelihood that this

exchange affected the outcome of the trial.

{¶ 76}   Next, Waller cites the following exchange, at the conclusion of his testimony:

Q.   And you described to this jury how upset you were.   Correct?

A.   Yeah.

Q.   And how scared you were.

A.   Correct.

Q.   What other words did you use?   Were you provoked?

A.   Fearful, I was scared.   I didn't mean for this to happen at all.   I didn't mean to kill Donald.

Q.   Well, that's not my question.   My question is how did you think to pick up the pill bottles?

A.   How did I think?

Q.   Yeah.

A.   I don't know.

Q.   If you have all those emotions running rampant in your head, how did you suddenly think I'm gonna pick up my pill bottles?

A.   Each one has different emotions at any given time.

Q.   I guess the pill bottles were more important to you in your health than helping Donald who had been stabbed severely.

MR. RION: Objection.

THE COURT: Sustained.

MR. MERRELL: No other questions.

THE COURT: Jury will disregard the last remark.

**{¶ 77}** Waller's mental state was an issue for the jury to consider, so the fact that he had had the presence of mind to pick up his VA medications after stabbing Argabright and before fleeing the scene was a legitimate point for the State to have elicited. The prosecutor's final remark was an argument, not a question, and Waller's objection was properly sustained. But the factual point had already been made for the jury to consider. We see no likelihood that the prosecutor's argumentative remark deprived Waller of a fair trial.

**{¶ 78}** Waller next turns his attention to remarks made by the prosecutor during closing arguments. He first cites the prosecutor's initial remarks in rebuttal argument:

> Quite frankly, I'm dumbfounded with that argument. I don't know how to respond to it. He did not concede one thing. He didn't even concede the tampering charge. He said Jason Waller, he must not have known there was an official proceeding, yet he knew he stabbed him in the heart. He had to know the value of that weapon. He doesn't even concede that to you folks. He doesn't concede one thing.

**{¶ 79}** There is nothing improper in arguing to a jury that aspects of the adverse party's argument are unreasonable. Because this was argument, the prosecutor was entitled to his rhetorical flourish that he was "dumbfounded" by Waller's argument.

**{¶ 80}** Waller next addresses a part of the State's initial closing argument:

> Jason Waller owned the property at 154 Kewbury, and it was in foreclosure. He allowed Donald Argabright, Stacy Young, and her children, * * * to live in the Kewbury house when he went to live with Doss Smith. He didn't

know how long it would be before the bank made them leave. He had given them possession and, under the law as tenants, they had certain rights.

MR. RION: Objection.

THE COURT: Overruled. Continue, please.

MR. CAREY [representing the State]: Then Jason was told to leave the home of Doss Smith. He had to live in either a small apartment or a motel room. He grew increasingly unhappy about the fact that Donald Argabright was living in the house on Kewbury. But Jason didn't have them sign a lease. So legally, they had a month-to-month tenancy.

MR. RION: Objection.

THE COURT: Sustained.

MR. CAREY: He had to give –

THE COURT: None of that is before – there's no evidence about those issues before the jury of the tenancy or landlord tenant. You will refrain from commenting about the landlord/tenant issues and rights.

MR. CAREY: He did have to give them a three-day notice to vacate.

MR. RION: Objection.

MR. CAREY: Your Honor, this was covered.

THE COURT: That was before the Court. Objection overruled.

**{¶ 81}** We see no error in the trial court's rulings in the above-quoted colloquy. From the testimony, including Waller's testimony, it is clear that he granted to Argabright and his family the exclusive right to reside at 154 Kewbury while Waller went off to live with Doss

Smith. Argabright was, in fact, given the right to live there by Waller. And although the general scope of landlord-tenant law was not before the court, Waller's own testimony established that he was familiar with the requirement of a three-day notice before he could evict Argabright from his property.

**{¶ 82}** Finally, Waller cites the following exchange during the State's rebuttal argument:

You heard her [Stacy Young, Argabright's girlfriend] on the 9-1-1 call. We always tell the truth under stress like that. She said Jason Waller stabbed him. Where's the corroboration of what this man says? Julie Ferryman, his wife, supposedly heard some of this. Did she testify today? Huh-uh. Wonder why?

MR. RION: Objection.

THE COURT: Sustained.

**{¶ 83}** Waller seems to be arguing that he had a right to prevent his wife from testifying, and that by commenting on his exercise of that right, the State violated his constitutional rights. But the spousal privilege is statutory – R.C. 2945.42, not constitutional, and contains an exception where: "the communication was made or act done in the known presence or hearing of a third person competent to be a witness." It appears from the evidence in the record that the only testimony that Waller's wife could have given to corroborate his testimony would have concerned his telephone conversations with Argabright in the days preceding the confrontation; she was not present when the confrontation and stabbing occurred. Therefore, since she would have been testifying concerning a conversation in the known hearing of a third person, the statutory privilege would not have applied.

{¶ 84}   In any event, the spousal privilege is statutory, not constitutional.   We are aware of no authority for the proposition that the State may not comment concerning a spouse's failure to be called by the other spouse to testify in a proceeding in which that spouse is a defendant, and Waller has not cited any authority for that proposition.

{¶ 85}   Finally, because Waller's wife was not present during the confrontation and stabbing, the State's comment concerning her failure to testify, an objection to which was promptly sustained, was not likely to have had any impact on the outcome of the trial.

{¶ 86}   In short, we find no prosecutorial misconduct rising to the level of reversible error.   Even if Waller had moved for a mistrial based upon prosecutorial misconduct, he would not have been entitled to a mistrial upon that ground.   Waller's Third Assignment of Error is overruled.

## IX.   Conclusion

{¶ 87}   All of Waller's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

HALL and WELBAUM, JJ., concur.


Copies mailed to:

David A. Wilson
Jon Paul Rion
Hon. Richard J. O'Neill