[Cite as *State v. Ramey*, 2018-Ohio-3072.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27636 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-955 |
| | : | |
| JERRY V. RAMEY, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of August, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 36 North Detroit Street, Suite 102, Xenia, Ohio 45385
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Jerry V. Ramey, Jr., appeals from his conviction and sentence for murder and aggravated burglary. He contends the trial court erred by failing to merge the murder and aggravated burglary convictions. He further contends that the trial court erred in instructing the jury. Finally, Ramey claims that the convictions are not supported by the manifest weight of the evidence.

{¶ 2} We conclude that the trial court did err by failing to merge the murder and aggravated burglary convictions. We find Ramey's claims regarding the jury instructions to be without merit. We further conclude that his convictions are supported by the evidence in the record. Accordingly, the judgment of the trial court is affirmed in part, reversed in part, and remanded for resentencing.

## I. Facts and Procedural History

{¶ 3} This case arises from the March 21, 2016, death of Earl Davis, Jr. Davis was in his home located on Strand Avenue in Dayton when he was strangled to death by Ramey. Ramey was indicted on one count of murder (proximate cause aggravated burglary) in violation of R.C. 2903.02(B), one count of murder (proximate cause felonious assault) in violation of R.C. 2903.02(B), one count of aggravated burglary (physical harm) in violation of R.C. 2911.11(A)(1), and one count of felonious assault (serious harm) in violation of R.C. 2903.11. A jury trial was conducted over the course of five days in May 2017. The following facts are adduced from the trial testimony.

{¶ 4} Ramey and Davis, who had known each other since they were young, became close following the death of Davis's brother in 2013, and they began to spend

significant time together. On March 21, 2016, Ramey and Davis were drinking at Davis's home. At some point, Ramey went out to his car, at which time he noticed that $300 that he had placed in the console of his vehicle was missing. Ramey went back into the house and asked Davis if he had seen the money. Davis indicated that he had not. Ramey then returned to the car to search it again. Unable to find the money, Ramey returned to the house and asked Davis if he was sure he had not seen it. According to Ramey, Davis "went off" on him and was verbally abusive. Ramey testified that he informed Davis he was not accusing Davis of taking the money, but rather was just asking if he had seen it. Davis then told Ramey to get out of his house. Ramey stated that Davis was "real adamant" that Ramey leave his home. Ramey left the house, but as he was walking to his car, he heard Davis indicate that he had taken the money. Davis then told Ramey to stay away from his house.

{¶ 5} Ramey, after experiencing difficulty with his vehicle, ultimately parked the car at his grandmother's home. At this point Ramey decided to walk back to Davis's home in order to ask him to return the money. Ramey walked about a quarter of a mile when a friend, who was driving by, stopped to pick him up. The friend then dropped Ramey at the entrance to an alley near Davis's home. Ramey walked down the alley and walked into Davis's home through the back door. As he entered the home, he saw Davis, who said, "What's your fat [ass] doing here again?" Ramey and Davis began to walk toward each other, and Ramey gave Davis a shove to "get his attention." According to Ramey, Davis then came toward him and aggressively shoved him backward into the living room, where Ramey hit the edge of a loveseat before regaining his balance. Davis continued to come toward him, and Ramey realized that a fight was starting. Ramey tried to put

himself into an "advantageous position," and, thus, he lunged back at Davis, who tumbled over a couch with Ramey ending up on top of him. The pair fell off the couch and Davis jumped at Ramey, at which time Ramey pushed Davis back onto the couch. Ramey again was on top of Davis with his hands around Davis's throat and a knee on one of Davis's arms. Davis continued to struggle, but Ramey eventually noticed that Davis ceased to move, at which time he removed his hand from Davis's neck. Ramey left the house and went to a nearby drive-thru store where he purchased a bottle of wine. Thereafter, Ramey returned to his grandmother's home where he informed her and his aunt that he had strangled Davis and that he was going to turn himself in. He changed his clothes and left them in a pile on the living room floor. He then had his uncle take him to a local motel, where he spent the night.

{¶ 6} After Ramey left her home, his grandmother, Sarah Wilson, called Davis's mother and informed her that Ramey had strangled Davis. Wilson then called 911. The police responded to Davis's home and found his body on the living room floor. Ramey was arrested the following evening when he was located at a barber shop. He was belligerent and resisted attempts to place him in handcuffs. Officers were eventually able to subdue and handcuff Ramey who, due to his large size, had to be transported in a police van rather than a cruiser.

{¶ 7} An autopsy revealed that Davis had injuries to his neck, as well as hemorrhages in his eyes, consistent with strangulation. According to the coroner, Davis would have lost consciousness after 90 seconds, but it likely took four to six minutes of sustained pressure to the neck to cause his death. Davis had a blood alcohol level that was approximately three times the legal limit. At the time of his death, Davis was 5'10"

tall and weighed approximately 144 pounds.[1]   Davis's left hand was bandaged as a result of bone fractures which required the insertion of multiple metal rods.   Davis also had a recent surgery to his fractured right leg during which a metal rod was inserted to support the fracture.   The coroner discovered a gun in Davis's waistband.

{¶ 8} The jury convicted Ramey on all the indicted charges.   The trial court merged the two murder convictions and the State elected to proceed to sentencing on Count II, murder (proximate cause felonious assault).   The trial court also merged the conviction for felonious assault with the murder conviction.   The trial court sentenced Ramey to a term of fifteen years to life for the murder conviction and to a term of nine years on the aggravated burglary conviction.   Finally, the trial court ordered the two sentences to run concurrently for a total sentence of fifteen years.

{¶ 9} Ramey appeals.

## II. Merger

{¶ 10} Ramey's first assignment of error states as follows:

THE TRIAL COURT ERRED IN NOT ORDERING MERGER OF ALLIED OFFENSES AT SENTENCING.

{¶ 11} Ramey contends that the trial court erred by failing to merge the convictions for murder and aggravated burglary.   In support, he argues that they constitute allied offense of similar import because they share the underlying element of felonious assault.

{¶ 12} Section 10, Article I of the Ohio Constitution prohibits multiple punishments for the same offense. This prohibition is codified at R.C. 2941.25, which states:

---

[1] At the time of the altercation, Ramey weighed between 320 and 330 pounds.

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 13} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892 (*Ruff I*), the Ohio Supreme Court clarified the applicable standard when determining whether offenses merge as allied offenses of similar import as follows:

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

*Ruff* at ¶ 30.

{¶ 14} In *Ruff I,* the Supreme Court, with the above in mind, concluded that two or more offenses may result in multiple convictions if any of the following is true: "(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the

offenses were committed with separate animus or motivation." *Ruff I* at ¶ 25. This analysis is dependent upon the facts of each case because R.C. 2941.25, as noted, focuses on the defendant's conduct. *Id.* at ¶ 26.

{¶ 15} An appellate court applies a de novo standard of review when evaluating a trial court's R.C. 2941.25 merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012–Ohio–5699, 983 N.E.2d 1245, ¶ 28. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987).

{¶ 16} Ramey was convicted of murder (as a proximate cause of felonious assault) in violation of R.C. 2903.02(B), which provides:

No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

{¶ 17} Felonious assault is proscribed by R.C. 2903.11(A)(1), which states that "no person shall knowingly * * * cause serious physical harm to another * * *."

{¶ 18} Ramey was also convicted of aggravated burglary in violation of R.C. 2911.11(A)(1), which provides in pertinent part:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense

if * * * (1) [t]he offender inflicts, or attempts or threatens to inflict physical harm on another.

{¶ 19} The trial court, in declining to merge the murder and aggravated burglary convictions, found that the aggravated burglary was complete when Ramey entered Davis's home without permission, consent or privilege. The trial court also concluded that the murder of Davis was a new and separate offense.

{¶ 20} We have not found, and neither party cites, any cases addressing this exact issue. However, we find instructive the decision of the First District Court of Appeals upon remand in *State v. Ruff,* 1st Dist. Hamilton Nos. C-120533, C-120534, 2015-Ohio-3367 (*Ruff II*). In this case, the defendant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1) as well as rape. The First District stated, in pertinent part, as follows:

[R.C. 2911.11(A)(1)] requires that in addition to breaking into an occupied structure with the intent to commit a criminal offense, 'the offender inflict[ ] or attempt to inflict[ ] physical harm on another.' It is this physical-harm element that elevates the offense to aggravated burglary. Absent the physical-harm element – or a violation of (A)(2) involving a firearm or dangerous ordnance – the offense would be simple burglary.

* * *

* * * The aggravated-burglary offenses at issue here are somewhat unusual in that they involve two distinct harms: the intrusion into the sanctity of the home and the subsequent physical harm (here, the rapes). One harm—the intrusion in the dwelling—is separate and identifiable from the

harm caused by the rape offenses here, but the other harm—the physical harm—is not separate and identifiable.

Unfortunately, the [Supreme Court] in *Ruff* [*I*] did not explicitly say what we should do in a situation such as this one where one offense involves multiple harms, and one offense constitutes an aggravating element of the other. Fortunately, though, it did drop a few breadcrumbs.

The most obvious clue is the court's rejection of a "categorical rule" that aggravated burglary and rape are of dissimilar import. The state argued in the Supreme Court—as it does here—that rape and aggravated burglary are of dissimilar import because rape is a sexually oriented offense while burglary is about trespass into structures. Under this logic, aggravated burglary would always have a dissimilar import from rape or any other act of violence constituting the "aggravating factor," because aggravated burglary always involves a separately identifiable harm in the intrusion into a dwelling. The [Supreme Court] in *Ruff* [*I*], however, specifically rejected this analysis: it "decline[d] to create an absolute rule based upon the definition of the offenses." *Ruff*, [143 Ohio St.3d 114,] 2015–Ohio–995, [34 N.E.3d 892], at ¶ 26.

If there only needed to be one harm that was separate and identifiable, then rape and aggravated burglary could never merge because aggravated burglary will always involve the "separate and identifiable" harm caused by the intrusion into the dwelling. The same would be true of assault or any other crime constituting the aggravating element of physical harm for

aggravated burglary. Thus, implicit in its rejection of a categorical rule and remand to this court is the idea that the offenses are of similar import when the harm caused by one crime is the same harm that is the aggravating circumstance of another crime.

The court suggested as much in its discussion of similar import. It explained that offenses are "not allied offenses of similar import if neither is incident to the other." *Id.* at ¶ 23. It supported this proposition by citing to *State v. Moss*, 69 Ohio St.2d 515, 433 N.E.2d 181 (1982), a case the court summarized with this parenthetical: "aggravated burglary was not an allied offense of aggravated murder, because it was not incident to and an element of aggravated murder." *Ruff* at ¶ 23. In this case, the conduct constituting the rape was an element of the aggravated burglary. The rape was "incident to and an element of" aggravated burglary in that but for the conduct constituting the rape, the offense of aggravated burglary would not have [been] established. Only simple burglary could have been found.

Thus, we conclude that the most reasonable reading of the Supreme Court's decision in *Ruff* is that where the conduct that constitutes one offense causes a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense, then the offenses are of a similar import.

*Ruff II* at ¶ 3, 13-19 (footnote omitted).

{¶ 21} In this case, the trial court's jury instructions informed the jury that in order to be guilty of aggravated burglary, Ramey "must have trespassed with the 'purpose' to

commit the criminal offense of Felonious Assault and/or Aggravated Assault." The jury, by its verdict, concluded that Ramey had trespassed to commit the crime of felonious assault. Further, the State's closing argument included the statement that when Ramey trespassed in Davis's home, he had the purpose to commit felonious assault. Thus, we conclude, consistent with the First District in *Ruff II,* that Ramey's conduct constituting one offense (Davis's murder as a proximate cause of felonious assault), caused a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense (aggravated burglary). In other words, the murder as a proximate cause of felonious assault is the aggravating element necessary to make the burglary an aggravated burglary rather than a simple burglary. Without the physical harm caused by the felonious assault, the burglary would not have had the aggravating element of inflicting physical harm. Accordingly, we conclude that the trial court erred by failing to merge the offense of aggravated burglary with the offense of murder as a proximate cause of felonious assault.[2]

{¶ 22} The first assignment of error is sustained.

### III. Jury Instructions

{¶ 23} The second assignment of error asserted by Ramey states:

THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN

THE INSTRUCTIONS PROVIDED TO THE JURY.

{¶ 24} Ramey contends that the trial court erred by instructing the jury on the

---

[2] We note that this holding has no practical effect on Ramey's sentence as the trial court ordered the sentences for aggravated burglary and murder to run concurrently.

"castle doctrine" as part of the instruction on self-defense. He further contends that the trial court erred with regard to the instructions because it failed to give the jurors a correct copy of the instructions. Finally, he contends that the trial court erred by incorrectly instructing the jury on voluntary manslaughter.

{¶ 25} We begin with the claim that the trial court did not give the jurors a corrected version of the instructions for use during deliberations. During trial, the trial court instructed the jury using Court's Exhibit V. Each juror was provided a copy of the Exhibit. While reading the instructions to the jury, the trial court discovered four errors which it instructed the jurors to correct. With regard to the first error, the original instruction stated "before you can find Jerry Ramey guilty of the lesser offense of Involuntary Manslaughter, you must find: (1) The State proved beyond a reasonable doubt that on or about March 21, 2016, and in Montgomery County, Ohio, Jerry caused the death of Earl E. Davis, Jr., as a proximate result of Mr. Ramey knowingly causing serious physical harm to Earl Davis." The trial court, prior to reading that instruction, conducted a sidebar conference where the parties discussed the changes. No objections were made. The trial court then instructed the jury to cross out the words "knowingly causing serious physical harm to Earl Davis." The transcript then makes a notation that the jurors complied. The trial court then instructed the jurors to insert the following replacement: "committing or attempting to commit aggravated burglary, an offense of violence." An unidentified juror then asked the trial court to repeat the last words at which time the trial court repeated the entire correction. The trial court then reread that entire instruction as corrected. The remaining three corrections consisted of the trial court changing the words "all of" to "any of" in three separate places. Again, the trial court instructed the jurors to cross out the

incorrect words, then instructed the jurors to write in the corrections. Finally, the trial court noted that the jurors would have a copy of the instructions in the jury room during deliberations.

{¶ 26} Ramey claims that the record is devoid of any indication that the trial court gave the jurors a corrected copy of the instructions or that the jurors made the appropriate corrections to their copies of the instructions. We disagree. The record demonstrates affirmatively that with regard to the first and most significant correction, the jurors complied with the trial court's instructions. Further, one juror asked the trial court to repeat the corrected instruction. Also, the trial court read the corrected version of the instruction to the jury three separate times. There is nothing in the record to indicate that the jurors failed to comply with the three remaining corrections, and, of course, we presume that the jury follows the instructions of the trial court. *State v. Lackey*, 2015-Ohio-5492, 55 N.E.3d 613, ¶ 52 (2d Dist.). Finally, the trial court specifically stated on the record that the jurors would have a copy of the instructions with them in the jury room for deliberations. Thus, we find nothing to indicate that the jury had incorrect instructions in the jury room during deliberations.

{¶ 27} We next turn to the claims that the trial court erred in its instructions and the standards to be used in reviewing such claims. "Generally, a trial court should give a requested jury instruction if it is a correct statement of the law as applied to the facts of the particular case." *State v. Frazier*, 2d Dist. Clark No. 2008 CA 118, 2010-Ohio-1507, ¶ 37, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). A trial court's decision concerning whether or not to give a particular instruction will be reviewed under the abuse of discretion standard. *Clark v. Grant Med. Ctr.*, 2015-Ohio-

4958, 47 N.E.3d 526, ¶ 50 (10th Dist.). The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). However, "[t]he jury instructions given by a trial court must be a correct, clear, and complete statement of the law applicable to the case." *McBride v. Quebe*, 2d Dist. Montgomery No. 21310, 2006-Ohio-5128, ¶ 50, quoting *Roberts v. State Farm Mut. Auto. Ins. Co.*, 155 Ohio App.3d 535, 2003-Ohio-5398, 802 N.E.2d 157, ¶ 48 (2d Dist). When determining whether a jury instruction contains a correct statement of the law, a reviewing court applies a de novo standard of review. *State v. Franklin*, 2d Dist. Montgomery Nos. 24011, 24012, 2011-Ohio-6802, ¶ 82.

{¶ 28} Ramey claims that the trial court improperly included the "castle doctrine" when it instructed the jury on self-defense. The self-defense instruction, which extends over four pages of the transcript, tracks the self-defense instruction contained in the Ohio Jury Instructions (OJI). It properly stated that, in order to establish that he was acting in self-defense, Ramey had to meet a tripartite test which, relevant to the current discussion, required him to show that he did not violate any duty to retreat or avoid the danger that caused him to act in self-defense. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 44, citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. However, the trial court added the following instruction which does not track OJI:

A person who lawfully is in his residence has no duty to retreat before using force in self-defense. Where one is assaulted in his home, he may use such means as are necessary to repel the assailant from the house.

**{¶ 29}** This instruction is known as the castle doctrine, which "takes its name from the maxim that a man's home is 'his castle'." *State v. Waller*, 2d Dist. Clark No. 2013-CA-26, 2014-Ohio-237, ¶ 40, citing *State v. Comer*, 4th Dist. Gallia No. 10CA15, 2012–Ohio–2261, ¶ 11, citing 4 Blackstone, Commentaries on the Laws of England (Rev. Ed.1979) 223, Chapter 16. This doctrine was codified in 2008 and is set forth in R.C. 2901.09(B), which states that "[f]or purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another." The castle doctrine "relates to the applicability of the duty to retreat" prong of self-defense. *State v. Martin*, 2d Dist. Montgomery No. 27220, 2017-Ohio-7431, ¶ 39. The instruction is given when a defendant, who claims he used force in self-defense, is in his own home. We have not found, and the State has not cited, any case in which the castle doctrine instruction was given when, as here, the victim was in his own home and the defendant claimed he acted in self-defense.

**{¶ 30}** Ramey claims that by giving this instruction, the trial court "created the implication that there was a legal impediment that [he] had to overcome in order to raise his own legitimate defense of self-defense, when in reality, that legal hurdle should have never been applicable." However, as argued by the State, the instruction given by the trial court is a correct statement of law, and is arguably applicable given that Ramey claimed Davis started the altercation when he pushed Ramey into the edge of the

loveseat. Further, the trial court noted that it gave the instruction, with the instruction not mentioning Davis's name in connection therewith, due to the State's concern that the jury might think Davis should have left his home in order to retreat from the conflict.

{¶ 31} The instruction given by the trial court is a correct statement of the law. And, given the trial court's reasoning for its inclusion, we cannot say that its use was an abuse of discretion.

{¶ 32} Finally, we address the claim that the trial court erred with regard to its instructions on voluntary manslaughter. We agree with Ramey that the instruction was not correctly given. We find it troubling that the trial court repeatedly mislabeled the charge as involuntary manslaughter rather than voluntary manslaughter. Also problematic is the trial court's repeated identification of voluntary manslaughter as an affirmative defense and as a lesser-included offense, when it is not an affirmative defense and should be labeled as an inferior degree of murder. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). Finally, the trial court improperly omitted the term "knowingly" in its definition of voluntary manslaughter. However, before we determine whether Ramey was prejudiced by the trial court's instruction, we must first determine whether he was entitled to an instruction on voluntary manslaughter.

{¶ 33} Voluntary manslaughter is proscribed by R.C. 2903.03(A), which provides that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." "The Ohio Supreme Court has repeatedly cautioned that a trial court need not give the instruction every time 'some evidence' is presented going to

the inferior degree offense." *State v. Miller*, 2d Dist. Montgomery No. 22433, 2009-Ohio-4607, ¶ 22, citing *Shane* at 633. "To require the instruction to be given every time there is 'some evidence,' however minute, would mean that no trial judge could ever refuse to instruct on the inferior degree offense." *Id.*

{¶ 34} Ohio courts use a two-part test when considering whether to give a voluntary manslaughter instruction. *Miller* at ¶ 23. "In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in the particular case, actually was under the influence of a sudden passion or in a sudden fit of rage. It is only at that point that the ' * * * emotional and mental state of the defendant and the conditions and circumstances that surrounded [the defendant] at the time * * * ' must be considered." *Id.*, citing *Shane* at 634, quoting *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), at paragraph five of the syllabus.

{¶ 35} First, Ramey was not entitled to the voluntary manslaughter instruction based upon any potential claim that he was seriously provoked when Davis shoved him into the living room and, at least in Ramey's eyes, started the altercation. A "victim [is] within his rights in using reasonable force to repel [a] defendant from his home. Thus, his act of [shoving] the defendant could not provide the 'serious provocation' to reduce the defendant's conduct from [murder] to manslaughter." *State v. Johnston*, 2d Dist. Montgomery No. 19019, 2002 WL 1393988, *3 (June 28, 2002).

{¶ 36} Further, Ramey's own testimony indicated that he was afraid Davis would shoot him if Ramey released him. This testimony indicates that Ramey was not

overcome by sudden passion or a sudden fit of rage, because "fear is insufficient to demonstrate the emotional states of sudden passion or a fit of rage." *State v. Williams*, 7th Dist. Jefferson No. 11 JE 7, 2012-Ohio-5256, ¶ 24. *Accord State v. Beatty-Jones*, 2d Dist. Montgomery No. 24245, 2011-Ohio-3719, ¶ 30.

**{¶ 37}** We conclude that Ramey was not entitled to an instruction on voluntary manslaughter. Thus, any errors in the instruction were harmless. *Miller*, 2d Dist. Montgomery No. 22433, 2009-Ohio-46707, ¶ 28.

**{¶ 38}** The second assignment of error is overruled.

### IV. Manifest Weight

**{¶ 39}** Ramey's third assignment of error provides:

THE VERDICT OF THE JURY WAS AGAINST THE MANIFEST WEIGHT

OF THE EVIDENCE.

**{¶ 40}** Ramey contends that his convictions were not supported by the weight of the evidence because he demonstrated that he acted in self-defense. He further claims that the State failed to produce evidence sufficient to prove the element of trespass required for a conviction for aggravated burglary.

**{¶ 41}** A sufficiency of the evidence analysis focuses upon whether the prosecution presented adequate evidence, viewing such evidence in the light most favorable to the prosecution, to sustain the verdict. (Citations omitted.) *State v. Radford*, 2d Dist. Clark No. 2016-CA-80, 2017-Ohio-8189, ¶ 14. The prosecution has presented sufficient evidence when "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d

259, 574 N.E.2d (1991), paragraph two of the syllabus.

{¶ 42} A manifest weight analysis, in contrast, requires an appellate court to review the record, weigh the evidence and any reasonable inferences allowed by the evidence, consider witness credibility, and determine whether the trier of fact, in resolving any evidentiary conflicts, "clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered." *Radford* at ¶ 15. This consideration of the evidence must be exercised with caution so that a new trial will only be granted "in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Though different legal concepts are involved, if a verdict is supported by the manifest weight of the evidence, the evidence, by necessity, is legally sufficient. (Citations omitted.) *Radford* at ¶ 16.

{¶ 43} As noted above, the offense of aggravated burglary is defined by R.C. 2911.11(A)(1), which states, in pertinent part, that "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * * the offender inflicts, or attempts or threatens to inflict physical harm on another[.]"

{¶ 44} Ramey contends that the State failed to prove the element of trespass required by R.C. 2911.11(A)(1) for a conviction of aggravated burglary. In support, he argues that the evidence demonstrates that he was permitted to enter Davis's house any time he wished without first seeking permission. In support, he cites the testimony of Cynthia Moore who testified that in the past she had seen Ramey enter Davis's home

without asking permission, and that she never observed Davis tell him to leave. He further cites the testimony of Pietro Bass that Ramey was "more welcome [at Davis's house] than anyone else."

{¶ 45} "Trespass" is defined by R.C. 2911.21(A), which states that "[n]o person, without privilege to do so, shall * * * [k]nowingly enter or remain on the land or premises of another." "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). " 'Force' is satisfied by 'any effort physically exerted.' " *State v. Johnson*, 2d Dist. Montgomery No. 26961, 2017-Ohio-5498, ¶ 21, quoting *State v. Snyder*, 192 Ohio App.3d 55, 2011-Ohio-175, 947 N.E.2d 1281, ¶ 18 (9th Dist.). This court has held that "the effort necessary to open a door, locked or unlocked, is sufficient to satisfy the element of 'force' necessary to prove burglary." *State v. DeMoss*, 2d Dist. Champaign No. 2001-CA-5, 2002 WL 360581, *10 (Mar. 8, 2002), quoting *State v. Ford*, 2d Dist. Montgomery No. 15374, 1996 WL 257442, *2 (May 17, 1996).

{¶ 46} We cannot say that the testimony of Moore and Bass supported a finding that Ramey had free access to Davis's home. Neither witness claimed to have knowledge of the events and interactions between Ramey and Davis at the time in question. Moore's testimony merely indicates that at unspecified times when she was present, she had previously observed Ramey enter the house without having to seek permission. Her testimony did not establish whether this type of access was ongoing, or whether it occurred only when Davis was entertaining other people. And Bass's testimony does nothing to negate trespass on the day of the offenses. The jury, as the trier of fact, was free to disregard this evidence.

{¶ 47} Further, Ramey's own testimony supports a finding that on the day of the murder he had been told to leave Davis's home and also told not to return. He admitted that when he returned after being told to leave, he simply opened and walked through the screen door of Davis's home. He did not knock, announce himself or request to enter. Ramey also testified that when he entered the home, Davis asked him what he was doing there and indicated that Ramey entered without invitation. Ramey admitted he was aware Davis did not want him in his house. Ramey also admitted that when Davis came toward him, he shoved Davis. We conclude that this testimony alone is sufficient to establish the element of trespass. The State, in short, produced sufficient evidence to establish that Ramey trespassed into Davis's home.

{¶ 48} Ramey next contends that the jury's failure to find that he acted in self-defense was against the weight of the evidence. He argues that his testimony was undisputed and that there was no other version of the events for the jury to have believed. He notes that he presented evidence consisting of his own testimony as well as that of his grandmother, Sarah Wilson, that Davis had a reputation for violence. He also testified that, prior to Thanksgiving 2015, Davis pulled a gun on him and threatened to shoot him. He also notes that Davis had a gun on his person at the time of the offense. According to Ramey, when he had Davis on his back on the couch, he began to think that Davis "probably got [sic] his pistol on him," and that he began to believe Davis "might" shoot him if he broke free. While Ramey admitted that Davis never pulled a gun or knife during the instant altercation, he claimed that he was merely trying to keep Davis's hands from going towards his "waist or whatever, where he might have [his gun]." Ramey appears to argue that the jury was, thus, compelled to find that he acted in self-defense.

{¶ 49} To establish self-defense, a defendant must prove by a preponderance of the evidence that he (1) was not at fault in creating the situation giving rise to the fight, (2) had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape was through the use of deadly force, and (3) did not violate any duty to retreat or avoid the danger. *State v. Kucharski*, 2d Dist. Montgomery No. 20815, 2005-Ohio-6541. "If the defendant fails to prove any one of these elements by a preponderance of the evidence, he has failed to demonstrate that he acted in self-defense." *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990), quoting *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

{¶ 50} In *State v. Higgins*, 2d Dist. Montgomery No. 18974, 2002-Ohio-4679, this court discussed self-defense in the context of aggravated burglary:

The Ohio Supreme Court has stated that there are affirmative defenses that do not seek to negate any of the elements of the offense that the State is required to prove. *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166, (1986), citation omitted. One of these defenses is self-defense, which is characterized as a "justification for admitted conduct." *Id.* The Court has further explained this characterization as follows:

"Self-defense represents more than a 'denial or contradiction of evidence which the prosecution has offered as proof of an essential element of the crime charged * * *.' Rather, * * * this defense admits the facts claimed by the prosecution and then relies on independent facts or circumstances which the defendant claims exempt him from liability. Thus,

the burden of proving self-defense by a preponderance of the evidence does not require the defendant to prove his innocence by disproving an element of the offense with which he is charged.   The elements of the crime and the existence of self-defense are separate issues.   Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged."   *Id.*

The defense of self-defense requires a defendant to establish, among other things, that he was not at fault in creating the situation giving rise to the affray.   S*tate v. Barnes*, 94 Ohio St.3d 21, 24, 2002-Ohio-68, 759 N.E.2d 1240.   However, trespass is an essential element of the offense of Aggravated Burglary, as defined in R.C. 2911.11(A)(1) * * *.   In order for the jury to find [a defendant] guilty as charged, it necessarily had to find that he was trespassing when he injured [the victim].   This is inconsistent with the defense of self-defense, because it presupposes that [the defendant] was at fault in creating the situation that gave rise to the altercation. Thus, self-defense was not available as a defense * * *.

*Id.* at ¶ 17-19.

{¶ 51} In this case, Ramey was charged with murder as a proximate cause of aggravated burglary.   Ramey's own testimony establishes that he trespassed and that he was the first aggressor.   This evidence, standing alone, was sufficient to defeat the claim of self-defense as it demonstrated that Ramey's actions gave rise to the fight.

{¶ 52} Ramey also argues that, regardless of whether he trespassed or was the first aggressor, the jury should have found that the need for self-defense arose after the

fight progressed and he began to believe that he might be shot by Davis.

{¶ 53} However, the jury was not bound to find that Ramey had a bona fide belief he was in imminent danger. The jury heard the testimony of three witnesses who contradicted the testimony of Ramey and his grandmother that Davis had a reputation for violence. And the jury had Ramey's admission that he trespassed, that he knew he was not welcome even after he entered, and that he was the first aggressor. Also, Ramey admitted that Davis did not threaten deadly force at any time during the fight. It is also clear that Ramey was on top of Davis, and that he had at least one of Davis's arms pinned down. Further, the evidence shows that Ramey was more than twice the size of Davis, who was recovering from surgery to his leg and hand, both of which had healing fractures present at the time of his death. By his own testimony, it was not until Ramey had Davis effectively pinned down that he began to fear for his life. The jury could also have determined from the testimony of the coroner that Ramey had an opportunity to retreat after Davis passed out rather than continuing to apply pressure to his neck for an additional four minutes.

{¶ 54} We conclude that there was sufficient evidence in the record upon which the jury could rely in finding that Ramey trespassed. Further, given the facts in the record, we cannot say that the jury lost its way in rejecting the claim of self-defense.

{¶ 55} The third assignment of error is overruled.

## V. Conclusion

{¶ 56} The first assignment of error being sustained and the second and third assignments of error being overruled, the judgment of the trial court is affirmed in part,

reversed in part, and remanded for re-sentencing in accordance with this opinion.

. . . . . . . . . . . .

DONOVAN, J., concurs.

HALL, J., concurring in part and dissenting in part:

{¶ 57} I agree that there was no error in the trial court's jury instructions, and I agree that Ramey's convictions are not against the manifest weight of the evidence. In my opinion, however, the offenses of aggravated burglary and felony murder as a result of felonious assault do not merge. Therefore, I concur in part and dissent in part.

{¶ 58} Ramey was found guilty of four counts. In sequential order, they were felony murder, the proximate result of aggravated burglary, in violation of R.C. 2903.02(B); felony murder, the proximate result of felonious assault, also in violation of R.C. 2903.02(B); aggravated burglary in violation of R.C. 2911.11(A)(1); and felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1). At sentencing the trial court indicated the felony-murder counts merged with each other, and the State elected to proceed with sentencing on the second count, felony murder the proximate result of felonious assault. The trial court also determined that the stand-alone felonious assault count merged with the felony murder predicated on felonious assault. It is the stand-alone conviction for aggravated burglary that I believe does not merge with the conviction for murder as a proximate result of felonious assault.

{¶ 59} The indictment for aggravated burglary tracks the statutory definition that Ramey trespassed in an occupied structure with purpose to commit any criminal offense

and did attempt, threaten or inflict physical harm. (Indictment, Doc. # 4). Similarly, the State's wording of the May 5, 2017 bill of particulars included language that the trespass was for the purpose to commit "any criminal offense," supplemented with the alternatives felonious assault, aggravated assault, or assault. This wording was also read to the jury by the court during jury selection.[3] The prosecution referred to the identical wording, including the three potential criminal offenses, in its opening statement. (Tr. at 172). The trial court's initial draft of jury instructions indicated that the purpose of the entry was to commit any of the same three potential criminal offenses—felonious assault, aggravated assault, or assault. However, during the charge conference the court engaged counsel in discussions to "simplify" the instructions by deleting unnecessary clauses from the standard OJI instructions. To prevent giving an additional "simple assault instruction" that could possibly be "technically a lesser [offense]," the court deleted "assault" from the "any criminal offense" portion of the instruction with the State's acquiescence. (Tr. at 912-913). Nonetheless, the instructions as given, consistent with the aggravated burglary statute, explained that after entry into the occupied structure, aggravated burglary requires only that the offender "did recklessly inflict, attempted to inflict, or threatened to inflict *physical harm* on Earl E. Davis, Jr." (Emphasis added.) (Tr. at 953.) The court also provided the statutory definition of "physical harm," meaning "any injury, illness, or other physiological

---

[3] The court referred to count three of the indictment as requiring a trespass "with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure, any criminal offense, to wit: Felonious Assault (serious physical harm), in violation of §2903.11(A)(1) of the O.R.C., a felony of the second degree, and/or Aggravated Assault, in violation of §2903.12(A)(1) of the O.R.C., a felony of the fourth degree, and/or Assault, in violation of §2903.13(A) of the O.R.C., a misdemeanor of the first degree, and did inflict, or attempt or threaten to inflict physical harm on another." (Tr. at 8.)

impairment, regardless of its gravity or duration." (Tr. at 956.)

{¶ 60} We have held that aggravated burglary and felonious assault of a victim in the entered residence do not merge. *State v. Harmon,* 2017-Ohio-8106, 98 N.E.3d 1238, ¶ 64 (2d Dist.) ("[A]ggravated burglary was committed when Harmon broke into D.M.'s residence while carrying a loaded handgun with the intent to cause serious harm to D.M. Once inside the residence, Harmon went to D.M.'s bedroom * * * and shot D.M. in the face. Essentially, the aggravated burglary was completed before Harmon committed the felonious assault offense against D.M. by shooting her in the face. Contrary to Harmon's argument, felonious assault was not an element of aggravated burglary as charged in the indictment."). Other districts have ruled similarly. *See e.g. State v. Ortiz,* 6th Dist. Lucas No. L-14-1251, 2016-Ohio-974, ¶ 31-32 ("As to the aggravated burglary charge, the evidence presented at trial demonstrated that the aggravated burglary was committed when appellant hit M.C. and forcibly pushed his way into the apartment. * * * Once M.C. was knocked to the ground, appellant committed a felonious assault by 'stomping' on him."); *State v. McKinnon,* 7th Dist. Columbiana No. 16 CO 0011, 2017-Ohio-5784, ¶ 36 ("[A]ppellant completed the aggravated burglary when he entered L.T.'s apartment and caused her physical harm by striking her. But appellant continued to beat L.T. throughout various rooms in the apartment and the harm escalated to serious physical harm" [constituting felonious assault]); *see also State v. Bruce,* 7th Dist. Jefferson No. 17 JE 0023, 2018-Ohio-2478, ¶ 22 ("Thus, when appellant trespassed into D.W.'s hotel room by pretending to be her brother and threatened to kill her, the aggravated burglary was complete. Then when appellant hit, slapped, and stabbed D.W., he committed felonious assault.").

{¶ 61} In this case, Ramey admittedly realized that a fight was starting, and he shoved Davis backward and lunged at Davis, causing Davis to tumble over a couch with Ramey landing on top of him. This activity alone established the causing of physical harm, and at that point the aggravated burglary was complete. Then Ramey put his hands around Davis's throat and a knee on one of his arms and strangled Davis to death. That subsequent strangulation constitutes the "serious physical harm" necessary to support the felonious assault charge, which in turn supports the count-two murder charge. Therefore, the offense of murder as a result of felonious assault does not merge with the aggravated burglary, because those charges are the result of different and separate conduct. Although, in my opinion, the trial court should have instructed the jury that entry for the purpose to commit a simple assault also qualified as "any criminal offense," it matters not whether Ramey's purpose in entering the residence was to commit felonious assault because, having entered, if he stopped after only causing physical harm by the simple assault of Davis, the aggravated burglary already was complete. Strangling someone to death so far exceeds the "physical harm" required to complete the aggravated burglary that it constitutes separate conduct and precludes merger.

{¶ 62} The Ohio Supreme Court's decision in *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, provides further guidance about the holding in *Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892. In *Earley,* the Court concluded that misdemeanor operating a motor vehicle while under the influence and felony aggravated vehicular assault "are offenses of dissimilar import and significance that are to be punished cumulatively." *Earley* at ¶ 20. This is despite the fact that operating a vehicle while under the influence of alcohol is the predicate conduct for aggravated vehicular

assault. Therefore, here even if the purpose of entry into the residence was to commit felonious assault, under the *Earley* analysis, that conduct was not sufficient to require merger of aggravated burglary and murder as the proximate result of felonious assault.

**{¶ 63}** Finally, the import of causing the death of another, murder, is markedly different than the import of aggravated burglary, which primarily is a property offense, although use of threats or causing physical harm enhances the level of a burglary. Ordinary logic leads me to two conclusions. One, an offender who commits a murder after violating the sanctity of someone else's dwelling is a different offender than one who commits the same offense in the public arena. And two, an offender who breaks into a house to threaten or harm someone is a different offender that one who enters and kills the occupant. In either event, the offender should be eligible to be separately responsible for the offenses he has committed, and the offenses should not merge for sentencing.

**{¶ 64}** For the foregoing reasons, I concur in part and dissent in part.

Copies mailed to:

Mathias H. Heck, Jr.
Heather N. Jans
Jay A. Adams
Hon. Dennis J. Langer